Nor would the Court condition the warrantless arrest power on proof of exigent circumstances. Justice White concluded on the arrest issue:

> Law enforcement officers may find it wise to seek arrest warrants where practicable to do so, and their judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate . . . But we decline to transform this judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like. [Citations omitted.] 423 U.S. at 423, 96 S.Ct. at 827, 46 L.Ed.2d at 608, 44 U.S.L.W. at 4115–16.

The dissent of Justice Marshall, joined by Justice Brennan, is worth quoting at length. They, too, would find the arrests of De Leon and Colon to be valid, but under the more limited exigent circumstances doctrine. Justice Marshall writes:

> The signal of the reliable informant that Watson was in possession of stolen credit cards gave the postal inspector probable cause to make the arrest. This probable cause was separate and distinct from the probable cause relating to the offense six days earlier, and provided an adequate independent basis for the arrest. Whether or not a warrant ordinarily is required prior to making an arrest, no warrant is required when exigent circumstances are present. When law enforcement officers have probable cause to believe that an offense is taking place in their presence and that the suspect is at that moment in possession of the evidence, exigent circumstances exist. Delay could cause the escape of the suspect or the destruction of the evidence. Accordingly, Watson's warrantless arrest was valid under the recognized exigent circumstances exception to the warrant requirement, and the Court has no occasion to consider whether a warrant would otherwise be necessary. 423 U.S. at 434, 96 S.Ct. at 833, 46 L.Ed.2d at 615, 44 U.S.L.W. at 4119.

The arrests of De Leon and Colon would be upheld under either analysis. *United States v. Watson* directly supports the position and reasoning of my initial Memorandum Opinion and is now cited as authority therefor and made a part thereof.

**NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PERSONS (NAACP)–SANTA ROSA–SONOMA COUNTY BRANCH, Plaintiff,**

v.

**Carla HILLS, Secretary, United States Department of Housing and Urban Development, et al., Defendants.**

**No. C–75–2257 WHO.**

United States District Court,
N. D. California.

March 22, 1976.

Phillip J. Maddux, Andrews & Maddux, Santa Rosa, Cal., for plaintiff.

James L. Browning, Jr., U. S. Atty., William T. McGivern, Jr., Asst. U. S. Atty., San Francico, Cal., David Epstein, Dept. of Justice, Washington, D. C., for defendants Carla Hills, James H. Price, and The United States Dept. of Housing and Urban Development.

Derek J. Simmons, City Atty., Santa Rosa, Cal., Richard E. Brandt, McDonough, Holland, Schwartz & Allen, Sacramento, Cal., for defendants City of Santa Rosa, Murray Zatman, John Downey, Clement Guggiana, Gerald Poznanovich, Gregory Jones, Jr., The Community Development Commission of the City of Santa Rosa, and James K. Burns.

## OPINION

ORRICK, District Judge.

Plaintiff, a local chapter of the National Association for the Advancement of Colored Persons (NAACP), brings this action against defendants, Carla Hills, Secretary of the Department of Housing and Urban Development, the Department of Housing and Urban Development itself, and the Department's Area Director (HUD), the City of Santa Rosa (City), The Community Development Commission of the City of Santa Rosa (the Commission), and local officials, challenging approval by HUD of the City's Community Development Block Grant Application (application) submitted to HUD pursuant to Title I of the Housing and Community Development Act of 1974 (Title I). 42 U.S.C. § 5301 *et seq.* (1975 Supp.).

Plaintiff contends that the City's application for some $1.8 million in federal funds and HUD's approval thereof violates Title I in several ways. First, plaintiff claims that the City's proposal to use $550,000 of federal block grant funds in connection with an urban renewal project geared toward the development of a regional shopping center is illegal. Second, plaintiff challenges the failure of the City's program to provide funds for low and moderate income housing. Finally, plaintiff contends that inadequate opportunity for citizen participation was provided in the development of the City's plan.

Plaintiff seeks a declaration that the City's application violates various provisions of Title I, an order requiring HUD to allow the City to undertake an amendatory grant process in which adequate citizen participation is guaranteed, and an injunction against the expenditure of funds until the amended grant process is completed.

Plaintiff's motion for a preliminary injunction has now been consolidated with a hearing on the merits of the case. Presently before the Court are plaintiff's motion for summary judgment and defendants' cross-motions for summary judgment and/or to dismiss. An examination of the briefs, affidavits, and other supporting papers submitted by the parties reveals that there are no genuine issues of material fact bearing on the central issue of whether the defendants have violated the provisions of Title I. For the reasons hereinafter set forth, I find that the application of the City for funding for the fiscal year of 1975–76 under Title I and the approval thereof by HUD officials are not contrary to the provisions of the Act and are, therefore, valid.

*Preliminary Matters—Jurisdiction and Standing*

■ Before addressing the merits of the claims presented, certain preliminary matters deserve attention. Notwithstanding the federal defendants' suggestion to the contrary, this Court has jurisdiction over the subject matter of this suit under 28 U.S.C. § 1331. The case presents important questions arising under federal law and more than $10,000 is in controversy. *City of Hartford v. Hills,* 408 F.Supp. 889, Civil Action No. H–75–258 (D.Conn., 1976); *Knoxville Progressive Christian Coalition v. Testerman,* 404 F.Supp. 783 (E.D.Tenn., 1975).

The federal defendants have questioned the standing of plaintiff to bring this action, relying primarily on *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This was a case in which low income and minority residents around Penfield, New York, citizen taxpayers of the area, a home builders association, and nonprofit housing corporations brought suit against the City of Penfield and its municipal bodies claiming that the town's zoning ordinances had the purpose and effect of excluding persons of low and moderate income. Justice Powell, writing for the Court, determined that none of the plaintiffs had standing to raise the claims asserted. He held that to have standing, a plaintiff seeking to challenge exclusionary zoning practices:

" * * * must allege specific, concrete facts demonstrating that the challenged practices harm *him,* and that he personally would benefit in a tangible way from the court's intervention. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of 'a real need to exercise the power of judicial review' or that relief can be framed * *. * "". 422 U.S. at 508, 95 S.Ct. at 2210, 45 L.Ed.2d at 360.

Plaintiff here is an association composed of and representing minorities and persons of low and moderate income residing in Santa Rosa. Plaintiff alleges in its amended complaint that many of its members currently occupy substandard housing in the Santa Rosa area and are unable to afford suitable housing within their means. Plaintiff further alleges such persons would benefit in a tangible way from the Court's intervention in this case, presumably because a favorable ruling might make Title I funds available for potential rehabilitation of their homes or acquisition of real property on which low-cost housing could then be constructed.

■ Based on these allegations, I find that plaintiff has standing to maintain this action since its members have a personal stake in the outcome of the litigation and the interest sought to be protected is arguably within the zone of interests protected or regulated by the statute involved. *Warth v. Seldin, supra,* at 510–511, 95 S.Ct. at 2211, 45 L.Ed.2d at 361, 362; *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *City of Hartford v. Hills, supra.* I further find that plaintiff has met the *Warth* test by alleging sufficient particularized injury to the protected interests of its members to permit it to bring its claims into court. *City of Hartford v. Hills, supra.*

■ I also believe that plaintiff's claims are ripe for adjudication, notwithstanding the availability of post-approval remedies and audit procedures pursuant to which HUD can make adjustments in a local grant application. *See NAACP, Western Region v. Brennan,* 360 F.Supp. 1006 (D.D.C.1973). These post-approval remedies seem geared toward securing compliance with the application as approved, not with challenging the propriety of the expenditures in the first place.

*Summary of Title I*

Title I of the Housing and Community Development Act of 1974 (42 U.S.C. § 5301 *et seq.* (1975 Supp.)) consolidated a number of categorical grant programs into a single block grant program with the purpose of streamlining federal aid programs to localities and minimizing "front-end" federal re-

view of local development plans.[1] S.Rep. No.93–693, 93d Cong., 2d Sess., 1974 U.S. Code Cong. & Admin.News pp. 4273, 4324 (hereinafter cited as 1974 U.S.Code Cong. & Admin.News p. 4273 *et seq.*).

In place of the elaborate review by federal officials under the prior programs, Title I established a seventy-five day period within which HUD must review and disapprove the local application, or else it is automatically approved. 42 U.S.C. § 5304(f) (1975 Supp.). The local application must set forth a summary of a three-year community development plan which identifies community needs and specifies objectives for meeting those needs. 42 U.S.C. § 5304 (1975 Supp.). Although Title I was intended to expand the role and responsibility of local governments in implementing community development plans, it also established national pri-

orities for the use of community development funds.[2]

Thus, Title I requires that grants shall be made only on the condition that the applicant certify to HUD's satisfaction that the local application has been developed to give "maximum feasible priority to activities which will benefit low-or-moderate-income families *or* aid in the prevention or elimination of slums or blight." 42 U.S.C. § 5304(b)(2) (1975 Supp.) (emphasis added). This requirement is in accord with the central objective of Title I, which is:

" * * * the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." [3] 42 U.S.C. § 5301(c) (1975 Supp.).

1. The new Community Development Program replaced the following ten development programs administered by the Department of Housing and Urban Development: the Public Facilities Loan Program authorized by Title II of the Housing Amendments of 1955; the Open Space Program authorized by Title VII of the Housing Act of 1961; the Planning Advance Program authorized by Section 702 of the Housing Act of 1954; the Water-Sewer, Neighborhood Facilities and Advanced Land Acquisition Programs authorized under Title VII of the Housing and Urban Development Act of 1965; the Urban Renewal, Code Enforcement and Neighborhood Development Programs authorized by Title I of the Housing Act of 1949; and the Model Cities Program authorized by Title I of the Demonstration Cities and Metropolitan Development Act of 1966.
The Congressional purpose behind this shift to a block grant approach was to streamline existing procedures under the categorical programs and to reduce the considerable processing burden borne by HUD. Congress also intended to expand the role of local governments in formulating community development plans. 1974 U.S.Code Cong. & Admin.News at p. 4324.
As the Senate Report on Title I indicated:
"The Committee, however, intends to reduce significantly the unnecessary 'second-guessing by Washington' that has been criticized under existing programs. It believes that the shift from project to program review will accomplish this, in large measure. The statute would eliminate many of the determinations that the Secretary must now make under the categorical programs. At the same time, the statute would strengthen some provisions for statutory review in order to as-

sure an active and effective administration of the program." 1974 U.S.Code Cong. & Admin.News at p. 4325.
2. The Senate Report on Title I states:
"Grants should be made only on the basis of an application which the Secretary approves as fulfilling the objectives and the requirements of the act. The Committee rejected a revenue sharing principle of 'no strings' attached to grants-in-aid for community development. It adopted, instead, the principle that funds authorized and appropriated by the Congress should achieve national, as well as local objectives." 1974 U.S. Code Cong. & Admin.News at p. 4325.
3. The Act further provides:
"Consistent with this primary objective, the Federal assistance provided in this chapter is for the support·of community development activities which are directed toward the following specific objectives—
(1) the elimination of slums and blight and the prevention of blighting influences and the deterioration of property and neighborhood and community facilities of importance to the welfare of the community, principally persons of low and moderate income;
(2) the elimination of conditions which are detrimental to health, safety, and public welfare, through code enforcement, demolition, interim rehabilitation assistance, and related activities;
(3) the conservation and expansion of the Nation's housing stock in order to provide a decent home and a suitable living environment for all persons, but principally those of low and moderate income * * *." 42 U.S.C. § 5301(c) (1975 Supp.).

Title I directs HUD to approve the local application unless certain limited conditions exist: (1) the community's needs are not reflected in the application; (2) the proposed projects will not meet the needs described; or (3) the proposal does not comport with other legal requirements.[4] 42 U.S.C. § 5304 (1975 Supp.); *City of Hartford v. Hills, supra.*

In this case, the City submitted its application to HUD on May 14, 1975, with a request for $1.821 million in federal funds for the 1975–76 fiscal year. During the HUD review process, the HUD area office received several administrative complaints relating to the City's application. HUD determined that none of the complaints warranted disapproval of the application. The application was further found to meet all the requirements under Title I and the application was approved on June 23, 1975. The application calls for the expenditure of $550,000 for the Santa Rosa Center Project, Phase III, $410,000 for the Southpark Urban Renewal, $230,000 for Planning and Administration, $195,000 for Senior Citizens, Handicapped and Day Care Centers, $200,000 for Parks and Housing Sites, $130,000 for Traffic Control, and $106,000 as Contingency Funds.

### Scope of Review

■ In reviewing the action of the HUD officials in approving the Santa Rosa application, the relevant inquiry is whether the agency action was arbitrary, capricious, or an abuse of administrative discretion, or otherwise not in accordance with law. *Citizens to Preserve Overton Park v. Volpe,* 410 U.S. 402, 414–416, 91 S.Ct. 814, 822–823, 28 L.Ed.2d 136, 151–153 (1971).

### Plaintiff's Claims

Plaintiff first attacks the proposed use of $550,000 of the $1.8 million in block grant funds in aid of Phase III of the Santa Rosa Center Urban Renewal Project. This project is intended to revitalize the downtown area by the development of a regional shopping center.

The $550,000 at issue here is a small part of the total contemplated public contribution for the shopping center project which is estimated at $11.5 million. The contested federal block grant funds are intended to be used for site acquisition, clearance, and relocation expenses in connection with a specific parcel of downtown land. The site is presently occupied by a Sears store. Plaintiff raises three objections to the use of the $550,000 for these purposes.

■ Plaintiff first contends that the City's application is defective because it fails to indicate alternative funding sources as required by Section 104 of Title I. This section requires that the local application indicate "resources other than those provided under this chapter which are expected to be made available toward meeting" identified needs. 42 U.S.C. § 5304(a)(2)(B) (1975 Supp.). Plaintiff claims that this section has been violated because the City failed to mention that the public contribution for the downtown urban renewal project would have been raised by a local bond issue but for a litigation brought by another developer who is challenging the downtown project in state court. Plaintiff also complains of the failure to cite the private contribution to the proposed downtown shopping center project. However, the City's application does, in fact, mention that tax allocation funding is an alternative source of funding.

4. 42 U.S.C. § 5304(c) (1975 Supp.) provides: "The Secretary shall approve an application * * * unless—

(1) on the basis of significant facts and data, generally available and pertaining to community and housing needs and objectives, the Secretary determines that the applicant's description of such needs and objectives is plainly inconsistent with such facts or data; or

(2) on the basis of the application, the Secretary determines that the activities to be undertaken are plainly inappropriate to meeting the needs and objectives identified by the applicant pursuant to subsection (a) of this section; or

(3) the Secretary determines that the application does not comply with the requirements of this chapter or other applicable law or proposes activities which are ineligible under this chapter."

Moreover, defendants assert that even if the proposed bond issue were not mentioned, no such mention is required. Defendants argue that Section 5304(a)(2)(B) and 24 C.F.R. § 570.303 do *not* require that the applicant make mention of alternate funding for *each* project in the Community Development plan. They point out that the only requirement that a local applicant identify alternative funding sources for particular projects applies only to certain defined activities, among which urban renewal projects are not included. *See* 24 C.F.R. § 570.607. I agree and, therefore, find that the City's application is not defective for failing to indicate alternative sources of funding.

■ Plaintiff next argues that the proposed expenditure of the $550,000 for the shopping center project results in the reduction of local financial support in violation of Section 101(c) of Title I. 42 U.S.C. § 5301(c) (1975 Supp.).

Plaintiff argues that if these federal funds are used in this project, it will reduce the local contribution which will be raised by tax allocation bonds and thus thwart the intent of Congress:

"* * * that the Federal assistance made available under this chapter not be utilized to reduce substantially the amount of local financial support for community development activities below the level of such support prior to the availability of such assistance." 42 U.S.C. § 5301(c) (1975 Supp.).

Defendants point out that the "reduction of local support" provision is an expression of Congressional intent, not a grant requirement. Moreover, the proposed expenditure is only to compensate for added expenses caused in part by litigation about the project. The tax allocation bonds which plaintiff relied on to demonstrate noncom-

pliance with Section 5301(c) have not been locally approved and, therefore, cannot be construed as readily-available local support.

■ Third, plaintiff contends that the proposed downtown shopping center violates Section 101 of Title I because it is not primarily for the benefit of low and moderate income people.[5] This section defines as the "primary objective" of the Act the development of viable communities by providing decent and adequate housing and expanding economic opportunities "principally for persons of low and moderate income." 42 U.S.C. § 5301(c) (1975 Supp.).

Plaintiff suggests that the shopping center project will primarily benefit the middle class, not the poor of the City. However, Title I also states that the elimination of blight is an approved objective of community development activities. 42 U.S.C. § 5301(c) (1975 Supp.). Defendants argue that the urban renewal project is clearly consistent with the letter and spirit of the Act. As required by Section 104(b) of Title I, the City has certified that the downtown project gives "maximum feasible priority" to activities that will benefit low and moderate income families *or aid the prevention or elimination of blight.* 42 U.S.C. § 5304(b)(2) (1975 Supp.).

The City points out that by Municipal Ordinance No. 1741 the area to be redeveloped has been determined to be blighted, and that under state law this determination is conclusive. Cal.Health & Safety Code § 33368. It further argues that the area to be redeveloped meets the standards set forth under state law as a blighted area. *See* Cal.Health & Safety Code §§ 33030–33034.[6]

Defendants argue that plaintiff tries to focus too narrowly on the one particular site which will be acquired with the $550,000. This site is now occupied by a viable

---

**5.** The pertinent language of Section 101 provides:

"The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons

of low and moderate income." 42 U.S.C. § 5301(c) (1975 Supp.).

**6.** The regulations promulgated by HUD pursuant to Title I provide that "slum and blight" are to be defined pursuant to state and local law. 24 C.F.R. § 570.200(a)(1)(i).

Sears store. However, defendants point out that under state law non-blighted buildings may be included in "blighted areas" slated for redevelopment where, as here, their inclusion is found necessary for the effective redevelopment of the area of which they are a part. Cal.Health & Safety Code § 33321.

In addition, provisions of Title I itself sanction the land purchase, clearance, and relocation activities proposed for the downtown urban renewal project. 42 U.S.C. § 5305.

Accordingly, I find that the proposed use of federal funds in connection with Phase III of the Santa Rosa Center Urban Renewal Project does not violate Title I.

Plaintiff further argues that the failure of the City to allocate funds for the provision of housing for persons of low and moderate income violates Title I. It contends that the City is ignoring a clearly recognized need for low and moderate income housing, despite the mandate of Title I that any development program undertaken with federal funds should primarily benefit persons of low and moderate income. Plaintiff suggests that local applications for Title I *must* allocate funds for housing rehabilitation or acquisition of real property for low cost housing unless there is no housing need identified in the local application. It asserts that an application which fails to address a pressing need for housing is plainly inappropriate to meeting the needs and objectives identified in the application and, therefore, should not be approved by HUD. *See* 42 U.S.C. § 5304(c) (1975 Supp.).

However, plaintiff's assertion that the City's application is defective because the activities proposed to be undertaken in the area of housing are plainly inappropriate to meet recognized needs is not supported by the record. The application proposes to use $200,000 in Title I funds for "new housing and park sites". Plaintiff's suggestion that these funds will be employed primarily to acquire park sites is not supported by competent evidence. The City's application states that first priority will be given to the development of new housing sites. The City's application further allocates funds for planning activities associated with housing development.

In addition, the suggestion that the City has failed to provide any funds for the production of low income housing is inaccurate. The Housing Assistance Plan submitted by the City in connection with the Title I application indicates the City's intention to provide 50 units of new housing and 250 units of existing housing under another federal program during the first year.[7]

Despite noting some inadequacies in the City's housing plan, HUD determined that the plan clearly stated the City's housing needs and was not plainly inconsistent with other generally available data.[8] Plain-

---

7. The construction of new housing is not a permissible use of Title I funds. *See* 24 C.F.R. § 570.201(e). However, the City's Housing Assistance Plan specified a first year goal of 300 units of housing to be produced under Section 8 of the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974. 42 U.S.C. § 1437f. The 300 unit goal includes 250 units of existing housing and 50 units of new construction.

8. The Housing Assistance Plan submitted with the City's Title I application estimates that 3,470 of the City's 18,034 households are in need of housing assistance, almost half of these with special problems of elderly and/or handicapped members. Although the City's first year goal of 300 housing units was found to be acceptable by HUD, certain inadequacies in the City's plan were noted during the administra-

tive review process. The HUD Equal Opportunity Reviewer suggested that the housing assistance for lower income segments of the population could be upgraded by substantial rehabilitation endeavors. The HUD Housing Management Reviewer felt that the City should give more attention to elderly and large family households. The HUD Housing Production and Mortgage Credit Reviewer also indicated that the proportion of units to be allocated to elderly and larger families should be increased. He found that while the elderly represent 47.3% of the total housing need, the Housing Assistance Plan indicated that only 16.7% of the total resources to be made available were allocated to the elderly; similarly, he found that while large families represented 4% of the total housing need, only 1.7% of the total resources were planned for the provision of housing for large families. Moreover, the Housing Assistance

tiff's contentions regarding the deficiencies in the City's application were considered by HUD in making the determination that the proposed housing-related activities were not "plainly inappropriate" to meet identified needs and objectives. In this connection, activities are not "plainly inappropriate" within the meaning of Title I merely because the local applicant does not attempt to address all of its recognized urban problems out of the first year's grant funds or because some citizens disagree with the judgments reached by the local officials responsible for the development of the application as to the activities proposed to be undertaken with Title I funds. While the City might well have allocated more funds to activities aimed at increasing the low and moderate income housing stock, especially for large families and the elderly, I cannot say that the City's application is plainly inappropriate in this regard. Nor can I say that HUD abused its discretion in approving the City's housing plans. Accordingly, I find no violation of Title I in regard to the City's proposals for housing-related activities.[9] Whether subsequent applications by the City might be "plainly inappropriate" to meet the pressing need for low and moderate income housing in the community is, of course, not before me at this time.

Plaintiff finally claims that its members were denied an adequate opportunity to participate in the development of the City's application as required by Section 104(a)(6) of Title I.[10]

Defendants assert that the City complied with all of Title I's requirements for citizen participation. The City held at least four public meetings concerning the application, and two meetings with community advocacy groups. Although several of the meetings were attended by only a few persons, over 100 people appeared at one meeting. Moreover, two City Council hearings were held at which the City's application was debated. Further, the Mayor of the City appointed an advisory committee to consider the application. Although conflicts developed in the advisory committee between the Mayor and some community representatives, citizens clearly had an opportunity to make their views known. The view of various citizens and community

Plan did not contain data addressed to the needs of the lower income persons who work but do not reside in the community. Nonetheless, the Program Manager of the San Francisco Area Office of HUD determined that on the basis of the standards set forth in Title I, the City's application and Housing Assistance Plan incorporated therein should be approved, in that the applicant's description of needs and objectives were not plainly inconsistent with significant and generally available data, the activities to be undertaken were not plainly inappropriate to meet identified needs and objectives, and the application did not fail to comply with Title I or other applicable law. (Supplemental Affidavit of Julian Fitzhugh in support of federal defendants' motion for summary judgment.)

9. The recent decision in *City of Hartford v. Hills,* 408 F.Supp. 889, Civil No. H–75–258 (D.Conn., 1976), is inapposite to the instant case. In *City of Hartford,* the City and low income residents of the City brought an action for declaratory and injunctive relief against seven surrounding suburban towns and the Secretary of HUD seeking to enjoin funding to those towns under Title I. The court ruled that the Secretary improperly approved the applications of the suburban towns for community

development funds under Title I in view of the communities' failure to properly assess the housing needs of those "expected to reside" in the towns as required by Section 104(a)(4)(A) of the Act. 42 U.S.C. § 5304(a)(4)(A) (1975 Supp.). The "expected to reside" issue has not been raised by the pleadings in this case.

10. This section provides that no grant may be made pursuant to Title I unless the application shall have been submitted to the Secretary in which the applicant:

"(6) provides satisfactory assurances that, prior to submission of its application, it has (A) provided citizens with adequate information concerning the amount of funds available for proposed community development and housing activities, the range of activities that may be undertaken, and other important program requirements, (B) held public hearings to obtain the views of citizens on community development and housing needs, and (C) provided citizens an adequate opportunity to participate in the development of the application; but no part of this paragraph shall be construed to restrict the responsibility and authority of the applicant for the development of the application and the execution of its Community Development Program." 42 U.S.C. § 5304(a)(6) (1975 Supp.).

groups objecting to the City's application were also made known to HUD.

The defendants point out that nothing in Title I or the regulations promulgated pursuant thereto takes away from the City the primary responsibility for the development of the local application. *See* 42 U.S.C. § 5304(a)(6) (1975 Supp.); 24 C.F.R. § 570.-303(e)(2). Plaintiff requests that the Court order the City to set up a citizens advisory committee and provide technical assistance to this committee so that the committee may plan for local development. Title I requires citizen input be considered, but it does not compel the drafting of the local application by community groups. While the creation of a citizens advisory committee as contemplated by the plaintiff might well be desirable, I find no support for such a requirement in the Act.[11] Nor do I find anything which makes it improper for the City to have set up a Community Development Task Force composed of city employees.

As the defendants point out, nothing in the Act requires that any person or group *concur* with the local community development plan as adopted by the local legislative body. See 24 C.F.R. § 570.303(e)(2)(iii).

Therefore, I find that the City has not violated the provisions of the Act regarding citizen input requirements.

In light of the above, I find that the HUD approval of the application of the City was not arbitrary, capricious, an abuse of discretion, or contrary to law.

Accordingly, I hereby GRANT defendants' motions for summary judgment, and DENY plaintiff's motion for summary judgment, and dismiss the complaint.

Defendants shall prepare and lodge with the Court by April 5, 1976, a form of judgment in form approved by plaintiff.

---

11. The Conference Committee Report on Title I indicates that the Senate Bill contained a provision not in the House version requiring applicants to involve residents of community development areas in the execution of community development activities and to provide adequate resources for their participation. The Conference Committee Report amended this requirement to make it clear that involving residents in the execution of community development activities and providing resources for their participation is *discretionary* with the applicant. Conference Report No. 93–1279, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News pp. 4449, 4452.