**PHILADELPHIA WELFARE RIGHTS ORGANIZATION**

v.

**Robert C. EMBRY, Jr., et al.**

**Civ. A. No. 77–1711.**

United States District Court, E. D. Pennsylvania.

Sept. 16, 1977.

Harold R. Berk, Community Legal Services, Philadelphia, Pa., for plaintiff.

James M. Penny, Jr., Asst. City Sol., Philadelphia, Pa., Nicholas J. Scafidi, Redevelopment Auth. of Philadelphia, Philadelphia, Pa., Mary Ann Clifford, Civil Div.—Economic Litigation Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

The Philadelphia Welfare Rights Organization (PWRO) has brought this suit seeking declaratory and injunctive relief against the Mayor of Philadelphia, the Director of the Philadelphia Office of Housing and Community Development, the Redevelopment Authority of Philadelphia and its Executive Director, the Secretary of the United States Department of Housing and Urban Development (HUD), and the Acting Area Director of the Philadelphia Area Office of HUD. Plaintiff alleges that the defendants have violated Title I of the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301–5317 (Title I) by failing to allocate sufficient funds to the benefit of low-income families under the Philadelphia Year III Community Development Block Grant Program. Defendants have all moved for summary judgment.

The major issue in this case is whether Title I requires the City of Philadelphia (City) to allocate funds received for housing rehabilitation activities for the benefit of both low-income and moderate-income families in proportion to their percentage in the City's population. After careful consideration of the statutory background of Title I and the circumstances surrounding Philadelphia's application for funds under that Act, we have concluded that the approval of Philadelphia's Year III Community Development Block Grant application was not contrary to the provisions of Title I, and therefore grant defendants' motion for summary judgment.

## I. Summary of Title I

Title I of the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301–5317, consolidates several former categorical programs providing housing and community development funds into a single block grant program. Grant amounts are calculated by a formula which considers three factors with respect to each applicant community: population, extent of poverty, and the extent of housing overcrowding. 42 U.S.C. § 5306(b). Congress identified the primary objective of Title I as the "development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, *principally for persons of low and moderate income.*" 42 U.S.C. § 5301(c) (emphasis added).

In order to receive funds under Title I, the grant applicant is required to submit an annual application to the Secretary of HUD. This application must contain a summary of a three-year Community Development Plan, in which "community development needs" are identified and a program designed to meet those needs is formulated. In addition, a Housing Assistance Plan must be submitted which surveys "the condition of the housing assistance needs of lower-income persons," specifies an annual goal "for the number of dwelling units or persons to be assisted," and states the general location of the proposed housing for lower-income people. 42 U.S.C. § 5304(a). The applicant must also certify to HUD's satisfaction that its Community Development Program has been designed to "give maximum feasible priority to activities which will benefit low- or moderate-income families or aid in the prevention or elimination of slums or blight." 42 U.S.C. § 5304(b)(2).

Title I provides that the Secretary of HUD shall approve a grant application unless: (1) the applicant's description of community needs and objectives is "plainly inconsistent" with the "facts and data generally available," (2) "the activities to be undertaken are plainly inappropriate to meeting the needs and objectives identified by the applicant," or (3) "the Secretary determines that the application does not comply with the requirements of this chapter or other applicable law or proposes activities which are ineligible under this chapter." 42

U.S.C. § 5304(c). Any application submitted to HUD shall be deemed approved 75 days after receipt unless the Secretary informs the applicant of specific reasons for disapproval. 42 U.S.C. § 5304(e).

## II. Factual Background

The pertinent factual background of this action is undisputed. On March 1, 1977, the City of Philadelphia submitted to HUD its Year III Community Development Block Grant (CDBG) application for $57,163,000 in federal funds. The application was reviewed by defendant Robert J. Clement, Acting Area Director of the Philadelphia Area Office of HUD, and, in addition, by the Regional and Central Offices of HUD. This intensified level of review was recommended by defendant Robert C. Embry, Assistant Secretary of Community Planning and Development of HUD, as a means of dealing with the numerous complaints filed by community groups objecting to the City's CDBG application.

Among these complaints were the objections filed by the PWRO. The thrust of PWRO's objections, and the subject matter of this action, was that the City's CDBG application did not address sufficiently the needs of low-income families, especially with respect to the housing rehabilitation activities to be funded under Title I. PWRO contended that Title I required that the housing needs of low-income families be separately analyzed and that funds be targeted specifically to address those needs.

HUD responded to the City's CDBG application by noting numerous problem areas, many of which were similar to the concerns voiced by the community groups. These concerns were set forth in detail in letters sent to the City, dated March 15, April 11, and May 3. (See Exhibits 2, 7). The City continually revised its application in an attempt to meet HUD's objections.

HUD arranged to have a hearing at the Regional Offices on May 5, 1977, to deal with the various community grievances. Following the public hearing, HUD formally responded to the PWRO's complaints by letter dated May 13, 1977. With respect to PWRO's major objection, that the City's application failed to address the needs of low-income families in any significant way, the letter concluded:

> The CDBG regulations do not require any distinction between low income and moderate income persons or areas. CD activities can benefit either or both groups. The definition of low or moderate income persons is "persons, or lower income persons" whose income does not exceed 80% of the median family income of the area as determined by the Secretary.

(See Exhibit 15)

On the same date as its formal reply to PWRO, HUD approved Philadelphia's CDBG application. The approval contained the following condition: "All rehabilitation loans and grants must principally benefit low or moderate income families and individuals or directly aid in the prevention or elimination of slums and blight." In addition, the approval letter specifically recommended that the City "develop and/or expand its efforts to meet the needs of low and moderate income renters."

The Title I grant to be made to the City, as finally approved, consists of the following Housing Rehabilitation Activities:

| | |
|---|---|
| Loans and Grants | 575 units |
| LPA Rehabilitation | 217 units |
| Acquisition Subsidy/Rehabilitation | 175 units |
| Community Sponsored Projects | 40 units |
| Rehab Loan Guarantees | 150 units |
| Investor/Owner Demonstation Units | 50 units |
| Gift Property | 150 units |
| Total | 1457 units |

(See Exhibits 18 at 56–59 and 19)

According to estimates made by the PWRO, only two of the housing rehabilitation activities will be used to benefit low-income people, "low income" defined by the PWRO as those people who are below poverty level as established by the Bureau of the Census. Those activities are the Loan and Grant Program and the Investor/Owner Demonstration Units. Furthermore, PWRO contends that experience with these programs suggests that no more than one-third of those units will in fact benefit low-income

people, or a total of 201 units. PWRO also notes that only approximately 5.1% of the LPA Rehabilitation units in the Years I and II Programs were sold to low income people, and estimates that approximately the same number will be allocated to low income persons out of the Year III funds, or a total of 42 units. Thus, out of a total 1457 units of rehabilitated housing, only 243 units, or 16.7% of the total units, will benefit low income people according to PWRO estimates. The defendants, while not in agreement with plaintiff's definition of "low-income person," [1] do not controvert plaintiff's estimate of the number of poverty-level persons who will benefit from the housing rehabilitation efforts, but contend that even according to plaintiff's own restrictive estimates, the City's Year III Plan is not in violation of Title I.

### III. PWRO's Standing to Bring Suit

■ Preliminarily, we must address PWRO's standing to bring this suit, which has been challenged by the municipal defendants. We find that PWRO does have standing.

As association may obtain standing in either of two ways: it may have standing in its own right, *see, e. g., NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), or it may have standing as representative for its members. *Hunt v. Washington State Apple Advertising Commission,* —— U.S. ——, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In the latter instance, the association must allege "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). PWRO here

seeks standing on behalf of its low-income members; therefore, it must demonstrate that those low-income members would have had standing had they brought this action on their own behalf.

The inquiry to determine if standing exists has essentially two aspects. As a constitutional minimum, the plaintiff must allege that he is injured in fact and that the actions of the defendant are the cause of that present or threatened injury. *Warth v. Seldin, supra.* Second, the plaintiff must demonstrate that the statutory enactment upon which the claim rests can be viewed as entitling those in plaintiff's position a right to relief, or, stated another way, that plaintiff is within the "zone of interests" to be protected by the statute. *Data Processing Service v. Camp,* 397 U.S. 150, 155–56, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Here, the second prong of the standing inquiry is clearly met, since one of the major congressional goals of Title I was to benefit low-income people. *City of Hartford v. Town of Glastonbury,* 561 F.2d 1032 (2d Cir. 1977) (en banc); *NAACP—Santa Rosa—Sonoma County Branch v. Hills,* 412 F.Supp. 102 (N.D.Calif.1976). Thus, it remains only to be determined if plaintiff has sustained injury in fact as a result of defendants' actions.

PWRO has clearly alleged concrete injury to its members: the inability to have the opportunity to obtain adequate housing. Further, the relief requested is designed to alleviate directly this injury. In the recent Supreme Court case of *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the Court denied the standing of low-income people who had been denied treatment at various hospitals to challenge the alleged decision of the Internal Revenue

[1]. The defendants note that the terms "low income" and "moderate income" are not defined in Title I itself nor in its legislative history. HUD regulations do, however, define "low and moderate income families" as families whose income does not exceed 80% of the median family income for the area. 24 C.F.R. 570.3(o). Defendants note further that in Title II of the Housing and Community Development Act of

1974, 42 U.S.C. § 1437f(f)(1), the term "very low-income families" is defined as families "whose income does not exceed 50 percent of the median income for the area." Defendants assert that this is an amount *higher* than the poverty level. However, due to our disposition of this matter, it is not necessary for us to determine which definition of "low income" is correct.

Service to grant favorable tax treatment to hospitals denying treatment to indigents. In *Simon,* the Supreme Court emphasized that even if it were to grant the relief requested by invalidating the disputed Revenue Ruling, there was no assurance that the hospitals would decide to provide treatment to indigents; they might instead decide to forego favorable tax treatment. *Id.* at 42–45, 96 S.Ct. 1917. Here, by contrast, the plaintiffs are not dependent upon the acts of third parties to alleviate the harm to them. The reallocation of Title I funds to benefit low-income people will directly result in an increase in the availability of housing units for low-income people. *See NAACP—Santa Rosa—Sonoma County Branch,* 412 F.Supp. 102 (N.D.Calif.1976), where the court upheld the standing of low-income persons to challenge alleged violations of Title I. *City of Hartford v. Town of Glastonbury, supra,* in which the Second Circuit sitting *en banc* reversed an earlier panel decision holding that low income residents had standing to challenge the validity of HUD's approval of funds under Title I, does not hold to the contrary. That case denied standing to low income residents of Hartford to challenge HUD's approval of Title I applications made by nearby suburban communities. In *City of Hartford* there was no guarantee that the relief sought, injunctions against the use of Title I funds by the suburban communities pending their submission of applications complying with Title I, would benefit the plaintiffs by increasing the housing subsidy funds available for use in Hartford. Thus, we conclude that the PWRO has standing to bring this suit.

## IV. The Merits

■ Plaintiff contends that the housing rehabilitation funds received by the City under Title I must be allocated proportionately to meet the needs of both the low and moderate income people in Philadelphia. Plaintiff does not challenge the sufficiency of the total amount of funds the City intends to allocate to meet housing needs, plaintiff contends only that those funds which are intended to be used to meet housing needs must be allocated to low as well as to moderate income people.

Plaintiff bases its argument on a reading of the statutory language, considered in light of the legislative history. 42 U.S.C. § 5301(c) sets forth the primary objective of Title I as being "the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, *principally for persons of low and moderate income.*" (emphasis added). In specifying the goals of Title I with respect to housing conservation and expansion, Congress provided that activities were to be directed to "the conservation and expansion of the Nation's housing stock in order to provide a decent home and a suitable living environment for all persons, but principally those of low and moderate income." 42 U.S.C. § 5301(c)(3). In answer to defendant's contention that 42 U.S.C. § 5304(b)(2), which sets forth the requirements for award of Title I grants, requires that the applicant's Community Development Program be developed "so as to give maximum feasible priority to activities which will benefit *low- or moderate-income families* or aid in the prevention or elimination of slums or blight," thus enabling applicants to benefit *either* low- *or* moderate-income families, the plaintiff argues that the word "or" was inadvertently inserted in that subsection instead of the word "and".

42 U.S.C. § 5304(c) sets forth the standard of review for Title I grant applications. That section provides that the Secretary of HUD shall approve grant applications unless the Secretary determines "that the activities to be undertaken are plainly inappropriate" to meeting the applicant's identified goals or that the "application does not comply with the requirements of this chapter or other applicable law." 42 U.S.C. § 5304(c)(2), (3). Plaintiff concedes that under the "plainly inappropriate" language of § 5304(c)(2), the standard of "abuse of discretion" governs the review of HUD's decision. However, plaintiff contends that § 5304(c)(3) sets forth an entirely different standard. Under the terms of

§ 5304(c)(3), an application must be refused if it "does not comply with the requirements of this chapter;" thus, the Secretary has no discretion to approve an application which clearly violates the terms of Title I. According to plaintiff, that is the case here because the allocation of housing funds is in violation of § 5304(b)(2). Assuming for the purposes of this case that plaintiff's interpretation of § 5304(c)(3) is correct, the major question to resolve in the instant case is whether or not Title I requires all funds dispersed pursuant to the CDBG Program to be divided proportionately between low and moderate income people.

The starting point for analysis of this statute must be the statutory language itself. Throughout the provisions of Title I, the expression "low and moderate income" is used frequently: § 5304(b)(1) refers to "low and moderate-income families," § 5301(c) refers to "persons of low and moderate income," § 5301(c)(1), (3), and (4) all use the expression "low and moderate income," etc. The drafters' use of this expression suggests that the group described, "low and moderate income" persons, was viewed as a single entity rather than as an entity made up of two distinct sub-groups.

Plaintiff contends that the consistent use of the expression "low- and moderate-income" buttresses its argument that the use of the term "low- or moderate-income" in § 5304(b)(2) was 'an inadvertent error. Plaintiff advances a plausible argument in support of its belief that the insertion of "or" was erroneous,[2] and cites *DeSylva v. Ballentine*, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956), for the proposition that "or" should be read as "and" if to do otherwise would subvert the clear legislative intent. Although we are not convinced that

§ 5304(b)(2) should be read "low *and* moderate income," for purposes of this case we are willing to assume arguendo that the word "and" should be read in place of "or".

However, even if § 5304(b)(2) is read "low *and* moderate income," there remain two possible ways of interpreting the statutory language. One possible interpretation is that, since the statute consistently uses the entire term "low and moderate income," Congress was referring to a single entity, any portion of which could be benefitted by Title I funded programs. On the other hand, the language may also be read as requiring that *each* subgroup within the targeted entity receive some benefit from CDBG programs. Under this interpretation, espoused by the PWRO, a program which does not provide any benefit to one of the groups specified would violate the statute.

However, even under this second possible interpretation, there is simply no basis for interpreting the statutory language as requiring proportional distribution of benefits as to each activity under the grant. Using plaintiff's own conservative estimates, 16.7% of the housing funds to be provided under the Year III grant will accrue to the benefit of low income people; this would be sufficient to meet the requirements of § 5304(b)(2). Thus, we conclude that under any reasonable interpretation of the language of § 5304(b)(2), the City's CDBG Program for Year III complies with the requirements of Title I.

Thus, it is clear that HUD's approval of Philadelphia's CDBG Program did not violate § 5304(c)(3), even under plaintiff's interpretation of that section, since the City's application complied with requirements of

**2.** Plaintiff notes that the Conference Committee Report states, in pertinent part:

The conference report contains, in place of the Senate provision, a requirement that the applicant certify to the HUD Secretary's satisfaction that its program has been developed so as to give maximum feasible priority to activities which will benefit *low- and moderate-income* families or aid in the prevention or elimination of slums or blight.

Conf.Rep. 93–1279, *reprinted* in 1974 U.S.Code Cong. & Admin.News at 4453. (emphasis added). Plaintiff emphasizes that the act could not have been amended after conference. As further support for its "inadvertence" theory, plaintiff states that a bill currently in the Senate, S. 1523, 95th Cong., 1st Sess., proposes to amend § 5304 to change "low or moderate" to "low and moderate."

§ 5304(b)(2). The only question remaining, then, is whether it was an abuse of discretion for HUD to approve the City's application where only 16.7% of funds targeted for housing programs will benefit low income people. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

We conclude that this was not an abuse of discretion. HUD instituted a careful evaluation of all the programs proposed by the City in its application. All objections to the City's application were transmitted to the City and thoroughly investigated by HUD. The procedures followed in approving the City's application were in some ways more thorough than those required by HUD's own regulations. *See* 24 CFR § 570.306.

Furthermore, the statute provides for automatic approval of a CDBG application unless the Secretary notifies the applicant of specific reasons for disapproval. 42 U.S.C. § 5304(f). This procedure suggests that there is a presumption of regularity given to CDBG applications which must be rebutted by the Secretary of HUD. *Ulster County Community Action Committee v. Koenig*, 402 F.Supp. 986 (S.D.N.Y.1975). In view of the statutory scheme and the careful review procedures used by HUD, we believe that no abuse of discretion has been demonstrated in this case.

Therefore, plaintiff's request for a preliminary injunction is denied and defendants' motion for summary judgment is hereby granted.