689 F.2d 593
 Juanita ALLEN, Annie L. Ponton, Lois Henderson and Marcy
Purdom, Plaintiffs-Appellants,
v.
Samuel R. PIERCE, Jr., in his official capacity as the
Secretary of the United States Department of
Housing and Urban Development, et al.,
Defendants-Appellees.
 No. 81-1591
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 21, 1982.
 James W. Piper, Legal Aid Soc. of Central Tex., Fred Fuchs, Austin, Tex., for plaintiffs-appellants.
 Hugh P. Shovlin, Asst. U. S. Atty., San Antonio, Tex., Steven Goldstein, Office of Gen. Counsel, U. S. Dept. of Housing and Urban Development, Washington, D. C., for defendants-appellees.
 Appeal from the United States District Court for the Western District of Texas.
 Before GEE, RANDALL and TATE, Circuit Judges.
 PER CURIAM:
 
 
 1
 Appellants, four low-income individuals, sued the Secretary of Housing and Urban Development ("Secretary") and four federally subsidized housing projects in central Texas. Suit against the housing projects was later dismissed by agreement. The gravamen of appellants' suit is to compel the Secretary to implement either a rent supplement program, 12 U.S.C. § 1701s,[1] or another low-income tenant subsidy[2] program at three Section 236[3] and one Section 221(d)(3)[4] housing projects in central Texas. Appellants contend that they would qualify for rent supplements if they were tenants of the housing projects and if rent supplements were provided at those projects.[5]
 
 
 2
 On cross-motions for summary judgment, the district court granted judgment in favor of the Secretary. The district court found that as a matter of law Congress did not intend appellants to have the type of relief requested. We affirm.
 
 
 3
 Resolution of an issue of statutory construction must begin with an analysis of the language of the statute itself. Bread Political Action Committee v. Federal Election Commission, --- U.S. ----, ----, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982) (quoting Dawson Chemical Co. v. Rohm & Haas Co., 448 U.S. 176, 187, 100 S.Ct. 2601, 2608, 65 L.Ed.2d 696, 699 (1980). Absent "a clearly expressed legislative intention to the contrary, the plain language of the statute controls its construction." Id. Under 12 U.S.C. § 1701s(a), the Secretary
 
 
 4
 is authorized to make, and contract to make, annual payments to a "housing owner" on behalf of "qualified tenants," as those terms are defined herein, in such amounts and under such circumstances as are prescribed in or pursuant to this section. In no case shall a contract provide for such payments with respect to any housing for a period exceeding forty years. The aggregate amount of the contracts to make such payments shall not exceed amounts approved in appropriation Acts, and payments pursuant to such contracts shall not exceed $150,000,000 per annum prior to July 1, 1969, which maximum dollar amount shall be increased by $40,000,000, on July 1, 1969, by $100,000,000 on July 1, 1970, and by $40,000,000 on July 1, 1971.
 
 
 5
 On its face § 1701s(a) does not create a mandatory duty to make the rent supplement program available at any specific federally subsidized project. Significantly, § 1701s(a) expressly limits the Secretary's authority to enter contracts to amounts approved in appropriation acts. Thus § 1701s(a) reflects a Congressional intent to limit the Secretary's authority by placing a cap on the dollar amount of each individual contract and by providing finite funds for the overall project.
 
 
 6
 On appeal, appellants concede the plain meaning of § 1701s, however, they contend that judicial construction has limited the Secretary's discretion to implementing either the rent supplement program or another tenant subsidy program, such as the Section 8 Set-Aside and Troubled Projects programs. Appellants' argument is based on comments made by the Ninth Circuit in Sicuro v. Harris, 597 F.2d 1235 (9th Cir. 1979):
 
 
 7
 Section 1701s was designed to assist "qualified tenants" by reducing their rentals. The Secretary must therefore administer the rent supplement program for those tenants. If, however, the Secretary determines that the "qualified tenants" at WTA would receive greater assistance from another applicable program, then it would be within her discretion to implement an alternative to the rent supplement program.
 
 
 8
 Id. at 1236 (footnotes omitted).
 
 
 9
 In response, the Secretary urges that Sicuro stands as an anomaly and is unsupported by either the plain language of the housing statutes or their legislative history. The Secretary further argues that he has neither the authority nor the resources to implement a rent supplement program at the housing projects in issue and that these housing projects do not qualify for either the Section 8 Set-Aside or the Troubled Projects programs. An analysis of the Secretary's position shows it to be meritorious.
 
 
 10
 Section 101 of the Housing and Urban Development Act of 1965, 12 U.S.C. § 1701s, authorized the rent supplement program to subsidize the rental payments of low-income tenants of certain federally-insured housing projects. The Secretary makes rent supplement payments through contracts with the project owner. 12 U.S.C. § 1701s. Acting in the belief that the rent supplement program was a disservice to Congressional purposes and policies, the Secretary ceased executing new contracts on January 5, 1973. This decision was upheld in Commonwealth of Pennsylvania v. Lynn, 501 F.2d 848 (D.C.Cir.1974). Towards the latter part of 1973, Congress, in apparent acquiescence to the Secretary's position, ceased providing funding for new contracts. In 1976 and 1978, Congress appropriated additional funds for the rent supplement program. However, the House Report for the 1976 appropriations act clearly stated that the appropriations were for a limited purpose:
 
 
 11
 However, the Committee wants to make clear that the release of these rent supplement funds is only available for meeting legitimate cost increases occurring from inflationary pressures. None of this contract authority is available for any new rent supplement units or a reimplementation of the program.
 
 
 12
 H.R.Rep.No.313, 94th Cong., 1st Sess. 7 (1975). The corresponding Senate Report echoed the House's reasoning:
 
 
 13
 The Department informed the Committee that under some circumstances the funds would be used to increase the number of units receiving assistance in existing projects, where possible under the law and where such increases are necessary to insure the economic viability of the project.
 
 
 14
 S.Rep.No.326, 94 Cong., 1st Sess. 16 (1975).
 
 
 15
 Appellants contend that the Senate report contradicts the statement in the House report and reflects a Congressional intent to fund new rent supplement units. We do not agree. When the two reports are read together, the better view would be that Congress appropriated these funds in 1976 to cover rent increases under existing contracts with the awareness that the Secretary may increase the number of units receiving rent supplements at a project that was already under a contract to prevent the project from defaulting on its HUD-insured mortgage. Also, it was Congress' intent to maintain the Secretary's moratorium on entering into contracts at projects that previously had no rent supplement units.
 
 
 16
 The House Report to the 1978 appropriations act noted that "(t)hese funds are being made available for one year only and will help stabilize the financial condition of housing projects receiving rent supplement assistance." H.R.Rep.No.1350, 95th Cong., 2d Sess. 20 (1978). This language evinces the clear Congressional purpose of stabilizing existing properties that were the subject of HUD mortgages and no more.
 
 
 17
 Prior to the 1976 and 1978 appropriations, HUD had been using recaptured contract authority to fund rent increases under existing contracts. The 1976 and 1978 appropriations were made when HUD's recaptured contract authority was insufficient to fund the necessary increases. The operation or funding of the rent supplement program between 1973 to 1978 does not reflect a Congressional intent to execute new rent supplement contracts.
 
 
 18
 The same year appellants filed this lawsuit Congress rescinded rent supplement contract authority balances available or that would come due in fiscal year 1980. Pub.L. 96-103, 93 Stat. 771 (1979).
 
 The Senate Report stated:
 
 19
 Over the past few years rent supplement contract and budget authority have been used to amend existing rent supplement contracts so as to pay for rent supplement increases due to higher operating costs.
 
 
 20
 The Committee believes that additional assistance for rent supplement units should be provided exclusively through the troubled projects subsidy program ....... The Committee in recommending rescission of the rent supplement authority recognizes that the troubled projects subsidy gives the Department needed flexibility to make yearly adjustments in the levels of support provided so as to encourage good housing management practices whereas a rent supplement commitment binds the Department to make rent supplement payments for periods of up to 40 years.
 
 
 21
 S.Rep.No.258, 96th Cong., 1st Sess. 9-10 (1979).
 
 
 22
 In 1981 Congress rescinded additional budget and contract authority. Congress also indicated its intention that existing rent supplement contracts be converted to the Section 8 program and mandated use of the Troubled Projects funds as an interim measure for rent increases. The House Report stated:
 
 
 23
 In fiscal year 1981 the Department proposes to phase in the conversion of units currently assisted under the rent supplement program to the Section 8 program. The conversion of rent supplement assisted units will provide a long-term solution to the existing problem of inadequate funding to amend rent supplement contracts. The budget assumes that the conversion of approximately 23,000 rent supplement units to the Section 8 program during 1981 will result in the recapture of ... budget ... and ... contract authority. From this recaptured authority, it is proposed that (some) will be used in 1981 for amendments to units remaining under rent supplement contract. The remaining recaptured contract and budget authority will be rescinded. Flexible study funds will be used in the short-term until all units are provided additional rent supplement assistance or are converted to Section 8 assistance.
 
 
 24
 H.R.Rep.No.1114, 96th Cong., 2d Sess. 6 (1980).
 
 
 25
 Congress' intent to phase out rent supplement contracts existing when the Secretary ceased to execute new contracts in 1973 and not to authorize new rent supplement contracts is plainly evident. Whatever may have been the purposes and goals of the rent supplement program when it was enacted in 1965, Congress has apparently acquiesced in the Secretary's decision to cease executing new rent supplement contracts. We conclude that Congress has put the rent supplement program to rest.
 
 
 26
 Appellants also argue that it was Congress' intent that the Section 8 and Troubled Projects programs provide rental subsidies for low income families as an alternative to the rent supplement program in housing projects that previously had not received assistance under the rent supplement program. This argument misreads the clear import of the legislative history of these programs.
 
 
 27
 Authorized in 1974, the Section 8 Set-Aside program is aimed at housing projects with serious financial difficulties. The contract between HUD and the project owner establishes a maximum rent for each assisted unit. HUD pays the owner the difference between this maximum and the occupants' rent payment (which is established by certain criteria). 42 U.S.C. § 1437c(a), (c). Only one of the four projects involved in this lawsuit was found by HUD to be sufficiently needy to be invited to apply for assistance. The owner, however, did not apply.
 
 
 28
 The Troubled Projects program, authorized in 1978, assists certain projects to restore their financial soundness and maintain their low-to-moderate income character. 12 U.S.C. § 1715z-1a(a); 24 C.F.R. § 219.101 (1981). Under this program HUD awards one-year contracts to pay for necessary capital improvements rather than (1) risk foreclosure because the rental income is insufficient to pay for repairs and improvements or (2) forestall rent increases that would reduce the availability of units to low-income families. 12 U.S.C. § 1715z-1a. HUD found that of the four housing projects in issue none met the requisite criteria to be invited to apply for assistance under this program.
 
 
 29
 When the legislative history of the 1976 and 1978 appropriation measure is read in tandem with the text of the rent supplemental program several points emerge. First, existing contracts contained escalating clauses which obligated HUD to fund increases. Because HUD no longer received monies from Congress for this program, increases were funded through the agency's recapture authority. When this procedure proved unmanageable, Congress both appropriated monies and directed that funds, initially appropriated for Troubled Projects, be used to offset these contractual increases. Concomitantly, Congress rescinded most of HUD's recapture authority. There is no support for appellants' legal theory that Congress intended HUD to use Troubled Project funds to provide rental subsidies in cases where no rent supplements had previously been provided. Similarly, in the absence of independently qualifying for Section 8 assistance, there is no authority for the proposition that Congress intended these funds to be used as rent subsidies. We note that only one of the housing projects in issue qualified for Section 8 funding and that that owner refused to apply for assistance.
 
 
 30
 Alternatively, appellants argue that the Section 8 and Troubled Projects programs were intended to replace the rent supplement program in projects constructed after August 22, 1974, and that the Secretary was to continue to make the rent supplement program available to projects constructed before that date. While appellants' argument is novel, we are unpersuaded. In view of Congress' explicit purpose to convert rent supplement contracts to the Section 8 program and to use the Troubled Projects program as an interim funding source for increases in rent supplement contracts, this argument lacks merit.
 
 
 31
 Finally, appellants point to a 1980 Congressional appropriation for Section 8 housing to be used to assist elderly or handicapped families as supporting their legal theory. Our analysis shows that the appropriation was meant to render assistance to elderly or handicapped residents of a project who were paying more than 50 percent of their income in rent. 12 U.S.C. § 1715z-1(q). The Secretary has not implemented this program. Because the appellants have not argued that the Secretary is required to implement the program but only suggest it as another alternative to the rent supplement program, no further consideration is necessary.
 
 
 32
 It is well established that summary judgment is appropriate only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. United States v. R & D One Stop Records, Inc., 661 F.2d 433 (5th Cir. 1981). A review of the relevant authority compels the conclusion that Congress did not intend the appellants to have the type of relief they request. We echo the sentiments of the district court. "(I)t is with great sympathy for appellants in their plight that the court denies the relief requested, but the relief sought here would be more effectively and appropriately sought in the Halls of Congress." Accordingly, the district court's judgment is
 
 
 33
 AFFIRMED.
 
 
 
 [1]
 The Rent Supplement program, authorized by § 101 of the Housing and Urban Development Act of 1968 (12 U.S.C. § 1701s), is a rental assistance program that subsidizes a portion of the rental payments of lower-income tenants residing in certain HUD-insured multifamily projects. The program is utilized only in conjunction with the Section 221(d)(3) market interest rate program and, on a limited basis, with certain other housing insurance programs, including the Section 236
 The subsidy is in an amount which would reduce the out-of-pocket rental expense of a tenant to no less than 25 percent of his income. 12 U.S.C. § 1701s(d). By regulation, the tenant, at a minimum, must pay 30 percent of the unit rent. 24 C.F.R. § 215.25. The Secretary makes the Rent Supplement payments through a contract with the housing project owner by which the subsidy is paid directly to the owner on behalf of the tenant. 12 U.S.C. § 1701s(c). Housing and Urban Development ("HUD") contracts to subsidize a certain number of units in the project for 40 years for an agreed upon maximum dollar amount per year.
 
 
 [2]
 Appellants contend that Congress, in recognition of the national goal to achieve safe and sanitary housing, has enacted a number of federal housing subsidy programs to achieve the goal of enabling very low income tenants to reside at Section 236 and Section 221(d)(3) housing projects, see notes 3 and 4, infra. Appellants cite (1) the deep subsidy program, 12 U.S.C. § 1715z-1(f) (2) (designed to supplement costs in Section 236 projects constructed after August 22, 1974); (2) the Section 8 program, 42 U.S.C. § 1437f (a rental subsidy to be used in Section 221(d)(3) and 236 projects); (3) the Troubled Projects Operating Subsidy Program, 12 U.S.C. § 1715z-1a (provides funding to financially troubled Section 236 and 221(d)(3) projects with which the Department of Housing and Urban Development has rent supplement contracts under 12 U.S.C. § 1701s); and (4) a rental subsidy program designed to assist the elderly and handicapped, 12 U.S.C. § 1715z-1(q), for the proposition that a rent supplement program always operates in conjunction with another type of housing subsidy and it was Congress' intent that if one source of funding became unavailable a rent supplement program would be funded from these alternate sources
 
 
 [3]
 The Section 236 program, authorized by § 236 of the National Housing Act, as amended by § 201 of the Housing and Urban Development Act of 1968 (12 U.S.C. § 1715z-1) is a mortgage insurance program for multifamily housing projects that provides interest reduction payments in order to reduce rents for lower income families
 Under the Section 236 program, the Department of Housing and Urban Development makes interest reduction payments equivalent to the difference between the monthly payment for principal, interest, and mortgage insurance premium which the project owner is obliged to pay under a market rate mortgage and the monthly payment for principal and interest which the project owner would be obliged to pay under a hypothetical mortgage bearing an interest rate of one percent per year. A basic rental charge is established for each unit with the tenants being charged the basic rental or 25 percent of their income, whichever is greater. 12 U.S.C. § 1715z-1(f). If projects with Rent Supplement contracts, subsidy payments are made to the owners to defray the tenants' expenses when the basic rental exceeds 25 percent of the tenant's income.
 The Section 236 program subsidized three of the housing projects involved in the present action: (1) River Crest; (2) Georgetown Square; and (3) French Embassy. The Section 236 program was suspended by the Secretary in 1973. No additional mortgages have been insured under the program since that time.
 
 
 [4]
 The Section 221(d)(3) program, authorized by Section 221(d)(3) of the National Housing Act, as amended by the Housing Act of 1961 (12 U.S.C. § 1715l (d)(3)), helped finance the construction of multifamily rental housing for low and moderate income families. The program insured project mortgages at FHA ceiling interest rate. Projects bearing market interest rate mortgages normally had Rent Supplement contracts for 100 percent of the units. Under the provisions of Section 221(d)(5) (12 U.S.C. § 1715l (d)(5)), HUD was authorized to insure mortgages bearing a below-market interest rate as low as 3%. The savings to the owner between carrying a mortgage with a below market interest rate and one with a market interest rate is passed on to the low income tenants through lower rates
 Travis Park, the fourth housing program in issue, was subsidized through this program. Section 221(d)(3) is no longer being used to produce new housing and no new projects are being financed with mortgages insured under this program.
 
 
 [5]
 Before dismissal by agreement two of the four housing project owners raised the issue of appellants' standing to press this claim. The district court found that the requisite standing existed. In part relying on that holding and, in part, relying on the well settled maxim that the question of standing is jurisdictional, Warth v. Seldin, 442 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and questions of subject-matter jurisdiction may be raised at any time in the proceedings, Andrus v. Charlestone Stove Products Co., 436 U.S. 604, 607 n.6, 98 S.Ct. 2002, 2005 n.6, 56 L.Ed.2d 570 (1978), the Secretary now argues that appellants are without standing
 Although the Secretary did not raise this issue below, a challenge to standing implicates the question of "case or controversy" under Article III and hence requires our attention. The district court denied motions directed at standing by two subsequently dismissed defendants. Other courts have rejected standing challenges in similar cases. Davis v. Romney, 490 F.2d 1360, 1364-65 (3rd Cir. 1974) (inability to secure a decent home is an injury sufficient to confer standing); Philadelphia Welfare Rights Organization v. Embry, 438 F.Supp. 434, 437 (E.D.Pa.1977) (an alleged inability to have the opportunity to obtain adequate housing was a sufficiently concrete injury); Rocky Ford Housing Authority v. U. S. Dept. of Agriculture, 427 F.Supp. 118, 123-24 (D.D.C.1977) (substantial probability plaintiffs would be able to live in the project if rental subsidy were available supports standing); NAACP-Santa Rosa-Sonoma County Branch v. Hills, 412 F.Supp. 102, 106 (N.D.Cal.1976) (an inability to secure decent affordable housing is sufficient to confer standing).
 The plaintiffs' exclusion from these housing projects because of the Secretary's refusal to implement a rent supplement program is, moreover, analogous to the exclusionary zoning practices in Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), where the Court said that the plaintiff must "allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention." 422 U.S. at 508, 95 S.Ct. at 2210 (emphasis in original). The district court in Rocky Ford, supra, relied on Warth in deciding that one plaintiff who lived in nonqualified housing but had applied for qualified housing and another who would live in the qualified project if she could afford it both had standing to challenge the Secretary of Agriculture's refusal to implement the rural rent supplement program. 427 F.Supp. at 123-34. We conclude that plaintiff Allen, at least, who alleges that she "would apply" for housing were a subsidized project available, possesses sufficient standing to sue.