## STATE v. CROWN CENTRAL PETRO-LEUM CORP.

### No. 12268.

Court of Civil Appeals of Texas.
San Antonio.
Sept. 5, 1951.

Rehearing Denied Oct. 3, 1951.

John A. Young, and McCampbell, Wood & Kirkham, all of Corpus Christi, for appellant.

Vinson, Elkins, Weems & Francis, Houston, for appellee.

W. O. MURRAY, Chief Justice.

The State of Texas, acting by and through the County Attorney of Nueces County, for the benefit of itself, Nueces County and all other political subdivisions whose taxes are collected by the Assessor and Collector of Taxes of Nueces County, brought suit against Crown Central Petroleum Corporation, to collect delinquent ad valorem taxes in the total amount of $2,-608.46, including penalties and interest. The taxes were alleged to be due and owing by Crown Central Petroleum Corporation for the years 1943 to 1948, both inclusive, upon crude oil located within Nueces County, on January 1st of each of said years.

This case was submitted to the court without the intervention of a jury upon an agreed stipulation of facts, which had the effect of eliminating all questions except that of whether the crude oil had a taxable situs in Nueces County on January 1st of each of the tax years alleged.

The trial court held that the oil did not have such taxable situs in Nueces County and rendered judgment that plaintiff take nothing, from which judgment the State of Texas has prosecuted this appeal.

The stipulation is not lengthy and we here copy all material parts:

"(1) The Defendant, Crown Central Petroleum Corporation, is a Maryland Corporation having a permit to do business in the State of Texas and having its legal residence and corporate situs within the State of Texas in Harris County, Texas, where its refinery and officers are located. These same facts were true at all times involved in the above styled and numbered cause. The Defendant has been properly served with citation in the above styled and numbered cause.

"(2) That the Defendant had on the 1st day of January, in the following years, the following amounts of crude oil belonging to Defendant in storage awaiting transportation in storage tanks located in Nueces County, Texas, upon which crude oil the State of Texas and the County of Nueces undertook to levy state and county taxes as shown in the following list:

| Years | Description | State Tax | County Tax | Total |
|-------|-------------|-----------|------------|-------|
| 1943 | 84,519 bbls. | $178.74 | $425.94 | $604.68 |
| 1944 | 21,760 bbls. | 53.84 | 117.48 | 171.32 |
| 1945 | 32,589 bbls. | 105.55 | 175.92 | 281.47 |
| 1946 | 43,469 bbls. | 72.37 | 254.28 | 326.65 |
| 1947 | 26,879 bbls. | 116.13 | 209.69 | 325.82 |
| 1948 | 25,331 bbls. | 74.42 | 230.36 | 304.78 |
| | | | | $2,014.72 |

"If said crude oil was subject to taxation in Nueces County, Texas, interest and penalties on the above amounts accruing through the year 1949 amounted to $179.22 on State of Texas taxes and $414.52 on County of Nueces taxes, making the total amount of taxes, interest, and penalties due, if any, the sum of Two Thousand Six Hundred Eight and 46/100 Dollars ($2,-608.46).

"(3) The Defendant owns and operates and at all times involved in this suit owned and operated a refinery located in Harris County, Texas, in which it manufactures or processes various petroleum products from crude oil. All of the crude oil involved in this suit was acquired by the Defendant in Nueces County, Texas, to be transported to its refinery in Harris County, Texas, for processing, a small percentage thereof being produced from Defendant's own oil wells in Nueces County, Texas, but the bulk thereof being purchased from other oil producers out of oil wells owned by them in Nueces County, Texas. All of the crude oil involved in this suit purchased by the Defendant at the well or produced from its own wells was transported by pipe line to said storage tanks in Nueces County, Texas, from which tanks said crude oil was loaded upon barges or ships and transported by water to said refinery of Crown Central Petroleum Corporation in Harris County, Texas. All of the crude oil involved in this suit and caused to be transported through said storage tanks in Nueces County, Texas, was scheduled when it left the oil well from which it came and as it moved through the pipe line and before it moved into said storage tanks to be exported to a predetermined destination outside of Nueces County, Texas, to-wit, the Defendant's said refinery in Harris County, Texas. The crude oil involved in this lawsuit was accumulated in said storage tanks in the course of its further movement or continued movement to its destination, the refinery of the Company in Harris County, Texas. Said crude oil did not remain within in Nueces County any longer than was necessary to accumulate sufficient quantities for shipment to said refinery in Harris County by barge or tanker and, when sufficient quantities were accumulated, said crude oil was shipped to said refinery in Harris County by barge or tanker as soon as such transportation was available. None of said crude oil was held in said storage tanks for sale or awaiting a seller. None of said crude oil was sold, offered for sale, or available for sale from said storage tanks in Nueces County but was all definitely destined for Defendant's said refinery in Harris County. No processing was done on any of said crude oil in Nueces County and none of said crude oil was graded or packaged in cans or other containers in Nueces County. All of said crude oil was retained by Defendant and processed or refined in its said refinery after transportation thereto into other petroleum products sold by Defendant.

"Said crude oil involved in this suit moved out of said storage tanks in Nueces County and was transported to the Defendant's said refinery in Harris County as follows:

"(A) Of the crude oil located in said storage tanks in Nueces County on January 1, 1943, 9,864.61 barrels was shipped out of the County on January 10, 1943, 9,668.71 barrels was shipped out of the County on January 13, 1943, 10,228.04 barrels was shipped out of Nueces County on January 26, 1943, 10,050.38 barrels was shipped out of Nueces County on January 30, 1943, 9,997.30 barrels was shipped out of Neuces County on March 15, 1943, 9,995.37 barrels was shipped out of Nueces County on March 21, 1943, 9,950.75 barrels was shipped out of Nueces County on April 16, 1943, and the remainder thereof was shipped out of Nueces County on April 20, 1943.

"(B) Of the crude oil in said storage tanks on January 1, 1944, 7,396.23 barrels thereof was shipped out of Nueces County on January 6, 1944, and the remainder thereof was shipped out of Nueces County on March 4, 1944.

"(C) Of the crude oil in said storage tanks on January 1, 1945, all had been shipped out of Nueces County by April 30, 1945, a total of 68,923.11 barrels having been shipped out by that date.

"(D) Of said crude oil in said storage tanks on January 1, 1946, all had been shipped out of Nueces County by February 3, 1946, since 23,113.08 barrels was shipped out on January 4, 1946, and 21,812.64 barrels was shipped out on February 3, 1946.

"(E) Of said crude oil in said storage tanks on January 1, 1947, all. had been shipped out of Nueces County by March 6, 1947, 24,749.79 barrels thereof having been shipped out on January 20, 1947, and an additional 22,800.95 barrels having been shipped out of said tanks by March 6, 1947.

"(F) Of said crude oil in said storage tanks on January 1, 1948, most thereof had been shipped out by January 14, 1948, since 24,477.63 barrels were shipped from said storage tanks out of Nueces County on January 14, 1948, and by March 20, 1948, an additional 17,550.77 barrels of said crude oil had been shipped out of said storage tanks.

"While the specific barrels of oil in said storage tanks on January 1 of each year cannot be earmarked and identified, since the process of crude oil moving into and out of said storage tanks is continuous, a volume of crude oil equivalent to the total volume in said storage tanks on January 1 of each year involved in this suit had been moved out of said tanks after January 1 of each year by the dates indicated above.

"(4) If said crude oil was taxable in Nueces County, Texas, and if said crude oil was subject to having taxes levied or assessed thereon in Nueces County, then it is stipulated and agreed that said taxes were duly and regularly levied or assessed; that in all cases an election was required to authorize said taxes, such an election was held and such taxes were authorized by a vote of the qualified tax-paying voters of such political subdivision or district; that each political division in whose behalf this suit is brought was legally constituted and authorize to levy, assess, and collect such taxes, and said taxes, if said property was subject thereto, were fully and legally levied and assessed against said property and the owners thereof; and if said property was subject to such taxation in Nueces County, Texas, all things required by law to be done have been duly and legally performed by the proper officials.

"(5) That all of said above described property, being crude oil, was in storage tanks located in Nueces County, Texas, within the boundaries of said county and of each political subdivision in whose behalf this suit is brought, on January 1 of each year shown above, and under the facts and circumstances shown above.

"(6) The Defendant did not have a corporate domicile or legal residence in Nueces County, Texas, at any of the times involved in the above styled and numbered cause but at all of said times Defendant's corporate domicile and legal residence within the State of Texas was in Harris County, Texas, where its refinery and offices are located."

It may be deduced from the stipulation that the crude oil involved originated in Nueces County and was in storage tanks

located in Nueces County at the time the taxes were levied, and that said oil always has been and still was at the time of the levying of the taxes a part of the general mass of property owned by appellee in Nueces County, unless something happened to take it out of such mass. Appellee has attempted to show that something did happen which changed the taxable situs of this crude oil.

The stipulation shows that the crude oil has either been produced or purchased by appellee, a non-resident of Nueces County, and that such oil has been collected by pipe line and placed in storage tanks to await transportation by barge or tanker to Harris County. The stipulation does not show whether the pipe line is privately owned or is a common carrier. It does not show whether the storage tanks are privately owned by appellee, or are a part of the pipe line system, or are owned by someone else. Apparently there was no business connection between the pipe line, the storage tanks and the barges and tankers that would ultimately take this oil to Harris County. Apparently the crude oil had come to rest in the storage tanks and would remain there until appellee made arrangements to ship it to Harris County. Under such circumstances we cannot say that such oil was in transit on January 1st of the tax years. Neither can we say that such crude oil was only temporarily in Nueces County. It had always been in Nueces County and was stored there indefinitely. It would only be moved out of the county if, as and when arrangements were made by appellee for barges or tankers to take it out. The fact that the crude oil had been gathered and stored in tanks preparatory to its shipment by barge or tanker to Harris County was not sufficient to take it out of the general mass of property situated in Nueces County subject to taxation by the county. The gathering of the oil in tanks was only preliminary to beginning its shipment to Harris County. Coe v. Town of Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715. The mere intention on appellee's part to transport the crude oil was not sufficient to change its taxable situs. It would remain a part of the general mass of taxable property subject to taxation in Nueces County until it was actually delivered to a common carrier for a continuous journey out of the county, subject only to such interruptions as were necessary and incidental to its shipment. Coe v. Town of Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715. It is not shown that the pipe line was a common carrier, and even if it were its duty was only to carry the oil from the wells to the storage tanks, an intra county movement. It occurs to us that where property has always been located in a county it is permanently located and has a taxable situs there unless and until something is done, such as the delivery of it to a common carrier for transportation out of the county. The mere determining of the owner that such property will be ultimately shipped out of the county is not sufficient.

Our Constitution, Art. 8, § 11, Vernon's Ann.St. provides in part that property may be taxed in the county where situated. Art. 7153, Vernon's Ann.Civ.Stats., reads in part as follows: "All property, real and personal, except such as is required to be listed and assessed otherwise, shall be listed and assessed in the county where it is situated".

Our Supreme Court has had occasion to interpret the language used in our Constitution and statutes. In Great Southern Life Ins. Co. v. City of Austin, 112 Tex. 1, 243 S.W. 778, 780, the Supreme Court said:

"Our Constitution, therefore, in declaring that property shall be taxed *where situated,* has done no more than declare the common-law rule. The purpose of the Constitution in declaring that property should be taxed in the county *where situated* was merely to define the general jurisdictional unit for the exercise of the taxing power, and to confine the exercise of that power to the subjects of taxation within that unit. It did not define what was meant by the words 'where situated.' Since it had reference to the taxing power, it evidently meant property *where situated* for the purposes of taxation under the general principles of law as then understood. * * *

"Having determined that the constitutional provision under examination is to be construed in the light of the common law, we will next enter upon an inquiry as to the situs of property for taxation, as determined by the common law as developed and applied in this country. The authorities heretofore cited hold that taxes could only be imposed upon persons resident within the taxing district, or property situated therein, or business carried on, acts performed, or privileges enjoyed, within its limits. 26 R.C.L. § 234, p. 267, and other authorities supra.

"It is well settled that real estate may only be taxed in the municipality, county, or state in which it is actually located. 26 R.C.L. § 236, p. 269; * * *.

"Under the common law, 'mobilia sequuntur personam' was a well-established maxim, and personal property of every description was taxable only at the domicile of its owner, regardless of its actual location. This is still the basic principle upon which the taxation of personal property rests. 26 R.C.L. § 241, pp. 273, 274. But even prior to the Revolution the principle had been abrogated to the extent that, as between different towns and taxing districts, certain classes of tangible personal property had a taxable situs where employed in business, regardless of the domicile of its owner. 26 R.C.L. § 244, pp. 276, 277; * * *."

The ancient doctrine that tangible personal property should be taxed at the domicile of its owner has been greatly modified. In Cooley on Taxation, 4th Ed., Vol. 2, § 440, it is said:

"In relation to situs for purposes of taxation, there is much reference to the legal maxim 'mobilia sequuntur personam,' i. e., 'movables follow the person.' That maxim is sometimes loosely expressed in the phrase 'The situs of personal property is the domicile of the owner.' However, this maxim is merely a fiction of law. It was 'intended for convenience, and not to be controlling where justice does not demand it.' It is not of universal application, does not rest on any constitutional foundation, and gives way before express law. As has been said, 'the fiction that personal property follows the domicile of its owner' cannot be allowed 'to obscure the truth.' 'This rule,' it has been well said, 'is subject to so many exceptions and limitations that it is quite as liable to mislead as to furnish a correct guide, when considered alone.' So far as applied to taxation, it merely means that the situs of personal property for purposes of taxation is the domicile of the owner unless (1) there is a statute to the contrary, or (2) the property is tangible and has acquired an actual situs of its own in a state or place other than where the owner is domiciled, or (3), in case of intangible property, it has acquired a business situs in a state other than the one where the owner is domiciled. As thus limited, the maxim applies to taxation of personal property."

One exception to the rule that tangible personal property is only taxable in the county of the residence of the owner is, that tangible personal property which by its character and concrete form is capable of having a value and an actual physical situs, may be taxed in the county where permanently located. State v. Fidelity & Deposit Co. of Maryland, 35 Tex.Civ.App. 214, 80 S.W. 544.

The crude oil in this case, by its character and concrete form, is capable of having a value and it has always had an actual physical situs of a permanent nature in Nueces County. That actual physical permanent situs continues at least until it is delivered to a common carrier for transportation on a final and continuous journey out of the county. The mere intention of appellee to have it loaded on tankers or barges and transported to Harris County is not sufficient to change the actual physical and permanent situs of this crude oil, which existed from the time the oil was produced in Nueces County until after January 1st of each of the tax years mentioned. As was said in Coe v. Town of Errol, 116 U.S. 517, 6 S.Ct. 475, 478, 29 L.Ed. 715: "But no definite rule has been adopted with regard to the point of time at which the taxing power of the state ceases as to goods exported to a foreign country or to another state. What we have already said, however, in relation to the

products of a state intended for exportation to another state will indicate the view which seems to us the sound one on that subject, namely, that such goods do not cease to be part of the general mass of property in the state, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation, to another state or have been started upon such transportation in a continuous route or journey. We think that this must be the true rule on the subject. It seems to us untenable to hold that a crop or a herd is exempt from taxation merely because it is, by its owner, intended for exportation. If such were the rule, in many states there would be nothing but the lands and real estate to bear the taxes. Some of the western states produce very little except wheat and corn, most of which is intended for export; and so of cotton in the southern states. Certainly, as long as these products are on the lands which produce them, they are part of the general property of the state. And so we think they continue to be until they have entered upon their final journey for leaving the state and going into another state."

We agree with appellee that the crude oil was not held in Nueces County for any business purpose of its owner, and if it had once been separated from the general mass of property subject to taxation in the county, its temporary detention thereafter would not give it a taxable situs in the county.

We are cited to cases where personal property is being transported through a county, or temporarily brought to rest in the county for no reason connected with its use in business, but only necessary to its transportation. The courts have held in such cases, and we think correctly so, that there is no taxable situs in such counties. The distinction here is, this crude oil was not being transported through Nueces County; it originated in Nueces County. It did not have to acquire a taxable situs in Nueces County, it had such a situs when it originated there, and that situs would continue until the oil was shipped out of the county, or at least delivered to a common carrier for that purpose.

We are also cited to many cases as to when personal property is regarded as being entered in interstate commerce and therefore beyond the jurisdiction of a particular state for taxing purposes, but such cases are not very helpful here, as we have no question of interstate commerce, only the removal of personal property from one county to another within the State.

The stipulation in this case shows that the crude oil has heretofore always been a part of the general mass of the taxable property of Nueces County, and it fails to show that anything had happened prior to January 1st of each tax year which would have the effect of removing it from such general mass of taxable property in the county.

The judgment of the trial court is reversed and judgment here rendered that appellant do have and recover judgment against appellee in the sum of $2,608.46, together with interest at the rate of 6% from November 28, 1950, until paid, together with all costs of this and the court below.

Reversed and rendered.