**CITY OF HOUSTON, Houston Independent School District, and William R. Brown, Jr., Appellants,**

v.

**MORGAN GUARANTY INTERNATIONAL BANK and Morgan Guaranty Trust Company of New York, Appellees.**

No. 01–83–0078–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 29, 1983.

Rehearing Denied Jan. 19, 1984.

Larry F. York, Baker & Botts, Houston, for appellees.

James B. Cameron-Stuart, Sr. Asst. City Atty., Joan C. Ward, Asst. City Atty., Houston, for appellants.

Before EVANS, C.J., and DUGGAN and BASS, JJ.

## OPINION

DUGGAN, Justice.

This is an appeal from a summary judgment enjoining the collection of city and school district ad valorem taxes on shares of a federally-chartered Edge Act corporation. Although the corporation maintains a branch office at the tax situs, its shares are wholly owned by a non-resident foreign corporation which maintains its home office in Florida.

Appellees, Morgan Guaranty International Bank ("MGIB") and Morgan Guaranty Trust Company of New York ("MGT"), filed suit against appellants, the City of Houston ("City"), the Houston Independent School District ("HISD"), their tax asses-sor-collector and their board of equalization, to enjoin collection of ad valorem taxes on shares of MGIB's stock for the tax year 1981. The appellees pleaded that MGIB's shares are not properly taxable because, under state and federal law, they have no "tax situs" in Texas. The appellants generally denied appellees' assertions and counterclaimed for delinquent ad valorem taxes in the amount of $191,892, together with penalties, interest, attorneys' fees, and costs as authorized by statute. Following a hearing on the parties' cross-motions for summary judgment, the trial court (1) denied appellants' motion urging that delinquent City and HISD taxes on MGIB shares were due and owing by MGT as a matter of law, and (2) granted appellees' motion permanently enjoining the appellants from attempting to collect 1981 taxes assessed on stock shares issued by MGIB and wholly owned by MGT. Eight points of error are asserted. We reverse and render.

In 1974, pursuant to Section 25(a) of the Federal Reserve Act, 12 U.S.C. §§ 611–631 (1976), commonly known as the Edge Act, Morgan Guaranty International Bank of Houston ("MGIBH") commenced operation in Houston. The Edge Act authorizes the establishment of federally chartered corporations "for the purpose of engaging in international or foreign banking or other international or foreign financial operations." 12 U.S.C. § 611. From its inception through the tax year 1980, MGIBH paid the ad valorem tax on bank shares to the appellants on behalf of its sole stockholder, MGT.

In 1978, Section 25(a) of the Federal Reserve Act was amended for the first time since the section's enactment in 1919, in order to make Edge Act corporations more competitive with foreign-owned banking institutions. International Banking Act of 1978, § 3(a), 12 U.S.C.A. § 611a note (West. Supp.1983); S.Rep. No. 1073, 95th Cong.2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 1423–24. By authority of the amending act, the Federal Reserve Board then issued regulations permitting banking

organizations established pursuant to Section 25(a) of the Federal Reserve Act to operate branch banks in the United States. 12 C.F.R. § 211.4(c) (1983).

Consequently, in 1980, all of the assets and liabilities of MGIBH were transferred to MGIB, and MGIBH's banking operations in Houston were converted to a branch operation of MGIB. MGIB also operates branch offices in Los Angeles and San Francisco. It has designated Miami, Florida, as its home office of corporate headquarters, and all of its capital stock is owned by MGT of New York.

Appellees MGIB and MGT did not challenge the valuation method or the apportionment formula used to assess the tax for the year 1981 on the bank shares issued by MGIB. They insisted, instead, that neither existing federal nor state statutes permit Texas to tax shares of MGIB's stock.

By their first point of error, the appellants contend that the trial court erred in permanently enjoining them from attempting to collect the 1981 taxes assessed on bank shares issued by appellee MGIB, in that the Edge Act, as originally enacted and as amended, *does* permit state taxation of the MGIB bank shareholders. The relevant portion of that act, not amended in the 1978 revisions, provides as follows:

§ 627. State taxation

Any corporation organized under the provisions of sections 611–631 of this title shall be subject to tax by the State within which its home office is located in the same manner and to the same extent as other corporations organized under the laws of that State which are transacting a similar character of business. The shares of stock in such corporation shall also be subject to tax as the personal property of the owners or holders thereof in the same manner and to the same extent as the shares of stock in similar State corporations.

12 U.S.C. § 627.

Both parties call this court's attention to one of only two published opinions which discuss a state's power to tax Edge Act banks since § 627's adoption in 1919. In

*Commonwealth of Pennsylvania v. First Pennsylvania Overseas Finance Corporation*, 425 Pa. 143, 229 A.2d 896 (1967), the Supreme Court of Pennsylvania observed that § 627 permitted Pennsylvania to subject the Edge Act corporation there involved to that state's capital stock tax since it "permits a state in which the home office of the corporation is located to tax the corporation as it would a corporation organized under its own laws." The corporation there was a wholly-owned subsidiary of a Pennsylvania corporation and had its home office in Philadelphia. The court's decision rested upon the definition of a domestic corporation within the meaning of the Pennsylvania taxing statute. The question here on appeal did not arise in that case, and could not have arisen before the act's 1978 amendment to permit interstate branch banking operations within the United States by Edge corporations. The state in which the home office of an Edge corporation was located at that time was also the only state in which the bank was doing business.

The United States Supreme Court mentioned § 627 in a footnote of an opinion as one of several statutes passed by Congress to protect federally chartered financial institutions from unequal and unfriendly competition caused by state tax laws favoring state-chartered institutions. *First Federal Savings & Loan Ass'n of Boston v. State Tax Commission*, 437 U.S. 255, 258, 98 S.Ct. 2333, 2335, 57 L.Ed.2d 187 (1978).

Both parties offer excerpts in their briefs from the 1919 Congressional Record to suggest the proper interpretation of § 627. Appellants quote portions of the Senate and House debates showing a distinct intention by Congress that financial entities organized under the Edge Act be subject to the same local taxes as other corporations in a state in which they are doing business. The appellees summarize part of the debate leading to the joint conference committee's proposal, which was ultimately adopted. This debate centered on whether shares of stock in Edge Act entities should be subject to taxation by the state of the sharehold-

er's residence as well as by the state in which the home office of the corporation is located. Appellees conclude that

nothing in the Congressional debates *summarized above* suggests that Congress intended that any states other than the state in which the home office of the Edge Act entity was located and the states in which the shareholders of the Edge Act corporation reside should be able to impose taxes on the shares of Edge Act corporations.

(Emphasis added).

Appellees further observe that when § 627 was enacted, Edge Act corporations were not authorized to operate branch offices. Since Congress made no change in the language of § 627 in 1978 when other sections of the Act were amended to permit branch offices, appellees conclude that Congress must have "overlooked the question" or "thought that the establishment of branch offices [in 1978] should in no way alter the tax policy established [in 1919] by § 627, which makes no provision for taxation of an Edge corporation by a state in which a branch office is located." As a result, appellees insist that the limitations on state taxation expressed in § 627 preempt any contrary provisions contained in state tax statutes.

The resolution of an issue of federal statutory construction begins with an analysis of the language of the statute itself, and absent a clearly expressed legislative intention to the contrary, the plain language of the statute controls its construction. *Allen v. Pierce*, 689 F.2d 593, 596 (5th Cir.1982). In every case involving the interpretation of a federal statute, the analysis must begin with the language employed by Congress. *Howe v. Smith*, 452 U.S. 473, 480, 101 S.Ct. 2468, 2473, 69 L.Ed.2d 171 (1981).

Principles of statutory construction used by Texas courts are the same. The dominant consideration in construing a statute is the legislative intent. *Minton v. Frank*, 545 S.W.2d 442, 445 (Tex.1976); *Calvert v. British-American Oil Producing Co.*, 397 S.W.2d 839, 842 (Tex.1965).

Where the intent is apparent from the words of the statute, it is not necessary to analyze the extrinsic evidence of legislative intent. *Minton, supra,* at 445; *Calvert, supra,* at 842. The intention of the legislature should be ascertained from the entire act and not from isolated portions thereof. *Calvert,* at 842. The recently enacted Code Construction Act, Tex.Rev.Civ.Stat.Ann. art. 5429b–2 (Vernon Supp.1983), provides, however, that a statute need not be ambiguous before consideration can be given to its objectives, legislative history, and surrounding circumstances, or to the common law or former law upon the same or similar subjects, the consequences of a particular construction, and other factors. § 3.03.

The first sentence of § 627 states:

Any corporation organized under the provisions of sections 611–631 of this title shall be subject to tax by the State within which its home office is located in the same manner and to the same extent as other corporations organized under the laws of that State which are transacting a similar character of business.

We are not concerned with a tax levied upon MGIB as a corporation, nor is Texas the location of its home office. The meaning of this first sentence is therefore relevant here only in its relation to the second sentence, which provides:

The shares of stock in such corporation shall also be subject to tax as the personal property of the owners or holders thereof in the same manner and to the same extent as the shares of stock in similar State corporations.

Taken in its entirety, the provision authorizes state taxation of both the Edge corporation itself and its shares as the personal property of the owners or holders. It speaks of no tax immunity or special tax exemption for either the corporation or its shareholders as a consequence of incorporation under the Act. While the language selected expressly permits the domiciliary state to tax the corporation and to include shares of the corporation in the valuation of the personal property of the owner for

taxing purposes, nothing in either sentence of § 627 restricts or forbids taxation by any other state. The provision does make clear that a taxing state must treat Edge Act banks the same as it treats its own state banks.

Section 3 of the International Banking Act of 1978, which amended the Edge Act, removed certain provisions that discriminated against foreign banks, eliminated or modified provisions that had handicapped Edge Act corporations in providing international banking services to United States customers and in competing with foreign-owned banking institutions, and defined more clearly the national purposes behind Edge Act corporations. 12 U.S.C.A. § 611a note (West.Supp.1983); S.Rep. No. 1,073, 95th Cong., 2d Sess., *reprinted in* U.S. Code Cong. & Ad.News 1424. A consequence of this amendment is the branch banking operation in which MGIB is now engaged.

However, nothing in the amending statute suggests any legislative intent to alter the plain meaning expressed in § 627 of the original act, the provision authorizing state taxation. Had Congress wished, as a part of its 1978 amendments, to grant tax immunity to Edge Act banking corporations in those states where they might thereafter conduct branch banking operations, it could have done so. Like national banks, Edge Act banks were subject to state taxation before 1978 in those states where they were conducting banking operations, i.e., their home states. Appellee MGIB admits that its predecessor, MGIBH, paid the ad valorem tax on its bank shares through 1980. That MGIB's home office is located in another state is not dispositive of the question.

> As a general rule, where the legislation dealing with a particular subject consists of a system of related general provisions indicative of a settled policy, new enactments of a fragmentary nature on that subject are to be taken as intended to fit into the existing system and to be carried into effect conformably to it, excepting as a different purpose is plainly shown.

*Hurwitz v. United States,* 208 F.Supp. 594, 596 (S.D.Tex.1962), *affirmed* 320 F.2d 911 (5th Cir.1963), *cert. denied* 376 U.S. 936, 84 S.Ct. 791, 11 L.Ed.2d 658 (1964) (quoting *United States v. Jefferson Electric Co.,* 291 U.S. 386, 54 S.Ct. 443, 78 L.Ed. 859 (1934) (both regarding amendment of the Internal Revenue Code).

■ Neither should we presume that Congress "overlooked" the branch bank taxation question. It is not a function of the United States Supreme Court to presume that Congress, in enacting legislation, was unaware of what it accomplished. *Albernaz v. United States,* 450 U.S. 333, 342, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981). Neither is it ours.

■ We hold that the Edge Act, as amended, does not prohibit the State of Texas from assessing ad valorem taxes on shares of stock owned by non-resident shareholders of an Edge Act bank doing business in Texas. This view of congressional intent is buttressed by review of the act's legislative history and Congress' long-standing practice of permitting federally chartered banks to be taxed by states where they are located. Appellants' first point of error is sustained.

■ Appellants urge, as their second and third points of error, that the trial court erred in enjoining collection of the 1981 taxes assessed on Edge Act bank shares to the extent that it relied upon either the Commerce Clause or the Due Process Clause of the Fourteenth Amendment of the United States Constitution as a prohibition.

These federal constitutional issues were not raised in pleadings or motions for summary judgment by any party. Further, appellees affirmatively state in their brief that they

> did not challenge the validity of the application of the Texas bank shares tax to [appellee] MGIB shares on due process or commerce clause grounds in the court below ....

The question whether Texas, consistent with the Commerce and Due Process

clauses of the Constitution, might adopt a statute taxing shares of Edge Act corporations having branch offices in Texas on an apportioned basis, which is the issue addressed in Points of Error Nos. Two and Three, is simply not before this court.

Based upon both the status of pleadings and appellee's renunciation of reliance upon federal commerce and due process clauses as grounds for relief, we decline to consider appellant's points of error two and three on the ground that they are not germane to the appeal.

Appellants contend by their fourth and fifth points of error that the court erred in granting the injunction because the ad valorem tax levied for 1981 on MGIB's bank shares is authorized by art. 7166 of the revised civil statutes, Act of March 31, 1885, ch. 111, § 2a, 1885 Tex.Gen.Laws 106, 9 H. Gammel, Laws of Texas 726 (1898), *repealed by* Act of June 13, 1979, ch. 841, sec. 6(a)(1), 1979 Tex.Gen.Laws 2329, and by § 11.02 of the new tax code, Tex.Tax Code Ann. (Vernon 1982). Both of these statutes were in effect in 1981. Article 7166 was repealed as of January 1, 1982. Act of June 13, 1979, ch. 841, sec. 3(j), 1979 Tex.Gen.Laws 2315. Although most of the tax code became effective January 1, 1982, Chapter 11, including § 11.02, took effect January 1, 1980. *Id.*, sec. 3(f).

The pertinent portions of art. 7166 are as follows:

Every banking corporation, State or national, doing business in this State shall, in the city or town in which it is located, render its real estate to the tax assessor at the time and in the manner required of individuals.... Every shareholder of said bank shall, in the city or town where said bank is located, render at their actual value to the tax assessor all shares owned by him in such bank....

Section 11.02 of the Texas Property Tax Code reads:

§ 11.02   Intangible Personal Property

(a) Except as provided by Subsection (b) of this section, intangible personal property is not taxable.

(b) Stock in a banking corporation, intangible property of an unincorporated bank, intangible property of a transportation business listed in Subchapter A, Chapter 24 of this code, and intangible property governed by Article 4.01, Insurance Code, or by Section 11.09, Texas Savings and Loan Act, are taxable as provided by law, unless exempt by law, if this state has jurisdiction to tax those intangibles.

(c) This state has jurisdiction to tax intangible personal property, other than stock in a banking corporation, if the property is:

(1) owned by a resident of this state; or

(2) located in this state for business purposes.

(d) This state has jurisdiction to tax stock in a banking corporation that is incorporated in this state or, if the bank is a national bank, is located in this state.

The Code Construction Act, Tex.Rev.Civ. Stat.Ann. art. 5429b–2, § 3.05(a) (Vernon Supp.1983) provides that in the case of any conflict between statutory provisions, the statute latest in date of enactment prevails. Because § 11.02 of the tax code is determinative as to whether the bank shares have a tax situs in Texas under state law, we decline to consider appellants' fourth point of error, which urges the applicability of art. 7166.

The appellees claimed in the summary judgment hearing that they were immune from taxation under § 11.02 because MGIB (1) is not a banking corporation, (2) is not a state or national bank, and (3) is not located in this state. We reject each of these contentions.

■ Appellees argument that it is not a banking corporation is refuted by its admission, in its first amended original petition, that MGIB is a "duly organized and existing Edge Act banking corporation."

Appellees' claim that MGIB is not "located in" this state requires a determination of legislative intent as to the meaning of the quoted phrase. The appellees argue that decisions by several Texas courts suggest that the term "located in" refers only to the legal domicile of a corporation, which would be Miami, Florida, in this case.

Section 2.01 of the Code Construction Act states:

Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.

Section 3.03 permits consideration of a number of "construction aids" in construing a statute, including the object sought to be attained, the common law or former statutory provisions, the consequences of a particular construction, and the administrative construction of the statute. Section 3.01 permits this court to presume that the legislature, in enacting a statute, intended a just and reasonable result and favors a public interest over any private interest.

With these criteria in mind, we turn to § 11.02(d), which states:

This state has jurisdiction to tax stock in a banking corporation that is incorporated in this state or, if the bank is a national bank, is located in this state.

The sentence indicates alternative circumstances under which the state has the right to tax bank shares: where the bank is one *incorporated* in this state and where the bank is *located* in this state. The issue then is whether "located in" means the same as "legally domiciled in" or "doing business in" or both. If the phrase refers only to legal domicile, then § 11.02(d) extends Texas' jurisdiction to tax bank shares of nondomestic banks only to shares of banks that have their home office or principal place of business in Texas. The statute would not authorize, therefore, the assessing of the ad valorem tax on shares of MGIB or any other branch bank having its home office outside the state.

Common usage suggests that "located" means settled, situated, established, found, discovered, or stationed. *Black's Law Dictionary* 847 (5th ed. 1979); *Webster's New Collegiate Dictionary* 669 (1981).

The appellants point to § 11.02(c)(2) of the statute, wherein the state is given jurisdiction to tax intangible personal property, other than stock in a banking corporation, if the property is "owned by a resident of this state" or "located in this state for business purposes." This language suggests that by "located in" the Legislature means "doing business in."

The language of Article 7166, the predecessor statute, clearly stated that every bank "doing business in this State" and the shareholders of "said bank" should be taxed "in the city or town where said bank is located."

▆▆▆▆ Appellees observe that Texas courts have generally equated a corporation's residence or domicile with the location of its principal place of business, and they cite a case in which the term "located" in an inheritance tax statute was held to equate with "domicile or residence." *San Jacinto National Bank v. Sheppard*, 125 S.W.2d 715 (Tex.Civ.App.—Austin 1938, no writ). Under the common law rule of *mobilia sequuntur personam* (moveables follow the person), the situs of personal property is the domicile of the owner. As stated in *State v. Crown Central Petroleum Corp.*, 242 S.W.2d 457, 461 (Tex.Civ.App.—San Antonio 1951, writ ref'd), when applied to taxation, this fiction of law

merely means that the situs of personal property for purposes of taxation is the domicile of the owner unless

(1) there is a statute to the contrary, or

(2) the property is tangible and has acquired an actual situs of its own in a state or place other than where the owner is domiciled, or

(3) in cases of intangible property, it has acquired a business situs in a state other than the one where the owner is domiciled.

*Id.* at 461. The Texas Supreme Court has observed that Texas constitutional and statutory provisions for taxing property owned by corporations make no distinction between that owned by domestic and that owned by foreign corporations. *Greyhound Lines, Inc. v. Board of Equalization for the City of Fort Worth,* 419 S.W.2d 345, 350 (Tex.1967). In interstate relationships the domicile of a foreign corporation is the state where incorporated, but its domicile for purposes of doing business in Texas is its principal place of business in this state. *Id.*

The most pertinent of the Texas decisions examining the tax situs of intangible property is *First Trust Joint Stock Land Bank v. Dallas,* 167 S.W.2d 783 (Tex.Civ.App.—Dallas 1942, writ ref'd). In that case a federal land bank, located in Dallas but whose stock was almost wholly owned by nonresidents of Texas, refused to pay property taxes assessed against its predecessor as agent for its nonresident stockholders. In upholding the assessment, the court explained that

> shares of stock of a banking corporation, being a species of personal property, [are] taxable in the state where the place of business or domicile of the corporation is located.... [H]aving determined the situs of the shares of stock held by nonresidents to be in the state where the association is located, such shares of stock are assessable for taxation....

*Id.* at 785. The bank was not a branch office having a principal place of business in another state, as is the case here; nevertheless, the case shows that, under the old statute, a bank was "located" wherever in Texas it was doing business or was domiciled.

■ We hold that the new statute means the same. The words "located in" have acquired no technical or particular meaning (except for their use in *San Jacinto, supra*) and should be given their plain meaning. Case law under the old taxing statute and that statute itself imply this meaning. The *Greyhound* case blurs any distinction between a legal domicile and a principal place of business in Texas as far as state taxation is concerned. Most important, the language of the statute itself (§ 11.02), taken as a whole, suggests an intention to include shares of any foreign banking corporations operating in Texas.

■ We find (1) that the phrase "located in this state" in § 11.02 means both doing business in this state and domiciled here, and (2) that MGIB is located here because it maintains a branch office in Houston.

Appellees' third argument for tax immunity is its claim that, because it is neither a state nor a national bank, it does not come within the coverage of § 11.02(d). That provision gives the state jurisdiction to tax stock in a banking corporation that is "incorporated in this state or, if the bank is a national bank, is located in this state." Since MGIB is not a bank "incorporated in this state," we must determine whether it is a "national bank" within the meaning of § 11.02(d).

Neither the act which enacted § 11.02 nor the predecessor statute, Art. 7166, contains any definition of "national bank." The Texas Banking Code defines a national bank as "[a]ny banking corporation organized under the provisions of Title 12, United States Code, Section 21, [the National Bank Act], and the amendments thereto." Tex.Rev.Civ.Stat.Ann. art. 342–102 (Vernon Supp.1983). In the absence of a specific definition of "national bank" for purposes of § 11.02(d) of the tax code, and in light of the fact that the term "national bank" is apparently defined but once in the Texas statutes, the appellees contend that the definition contained in the banking code is the best evidence of what the Legislature intended when it employed the term in § 11.02(d). Since MGIB was not chartered under the National Bank Act, appellees insist it cannot be a "national bank" within the purview of the taxing statute.

Appellees further argue that nowhere in the federal statutes governing the establishment and operation of Edge Act entities are they referred to as "national banks." They also point to the differences in and

limitations of the corporate powers granted Edge Act entities as compared to national banks organized under the National Bank Act.

■ The appellants urge that the term "national bank," as used in § 11.02(d), encompasses all banks chartered by the federal as opposed to state government. They observe that many writers have referred to the dual banking system operating within the United States and insist that these categories refer to the governmental *entity* under which the bank is chartered, and not to a particular *act*. We agree. "National bank" is defined in *Black's Law Dictionary* 923 (5th ed. 1979) as

> a bank incorporated and doing business under the laws of the United States, as distinguished from a *state* bank, which derives its powers from the authority of a particular state.

Appellants' theory that the words "state" and "national" in § 11.02(d) refer to the organizing body rather than the act governing the organization is further supported by reference in § 11.02(d) to the place of incorporation.

■ It does not appear that the Legislature meant to be bound by the narrow definition of "national bank" stated only in the definitions section of the banking code, either within that code itself or within the entire body of Texas statutory law. Article 342–102, *supra*, which contains this definition, is preceded by the following:

> As used in this code the following terms, *unless otherwise clearly indicated by the context*, have the meanings specified below.

(Emphasis added.) Article 342–908, another statute within the banking code, provides, in part, as follows:

> State and national banks are hereby declared to be within the same class under the Constitution and laws of this state. It is not the intention of the Legislature to discriminate between state banks, national banks, and private banks.

Article 7166, predecessor of § 11.02, provided, in part:

> Every banking corporation, State or national, doing business in this State shall ... render its real estate to the tax assessor....

We find no reason to believe that the Legislature, in enacting these statutes, intended to penalize or favor certain banks by excluding from their scope banks chartered by the federal government under acts other than the National Bank Act, particularly in view of its declared policy of fair and equal treatment stated in Article 342–908. The law favors competition in banking. *First National Bank of Grapevine v. State Banking Board*, 419 S.W.2d 878, 880 (Tex. Civ.App.—Austin 1967, writ ref'd n.r.e.). Furthermore, if Edge Act banks are not national banks, they are operating in Texas in violation of the Texas Constitution: Article 16, § 16, states that

> no foreign corporation, other than the national banks of the United States domiciled in this State, shall be permitted to exercise banking or discounting privileges in this State.

Tex. Const. (Vernon Supp.1983).

Judicial construction of Article 7166 lends further support to the argument that Edge corporations are subject to the bank shares tax under § 11.02(d). In *First Trust Joint Stock Land Bank of Chicago, supra*, the court found stock of a joint stock land bank organized under 12 U.S.C. §§ 810–824 and owned by non-residents to be assessable for taxation under Article 7166. It found, by looking at the state taxation provision of the federal act under which the bank was incorporated, 12 U.S.C. § 932, that Congress intended that state taxing authorities be empowered to assess such taxes.

In *Brenham Production Credit Ass'n v. Zeiss*, 153 Tex. 132, 264 S.W.2d 95 (1953), stock of a production credit association, organized under 12 U.S.C. § 1131d and owned by Texans who were not residents of Brenham, was not taxable under Article 7166 by the City of Brenham. The court found the association was not a banking corporation as contemplated by Article 7166.

In distinguishing *Brenham* from *Joint Stock*, the Supreme Court observed that while both organizations were created by virtue of provisions in Title 12 of the United States Code, the joint stock land bank had the historical characteristics of a bank, whereas the production credit association did not. It was also significant that the federal statute relating to state taxation of joint stock land banks provided for taxation by a state "in a manner and subject to the conditions and limitations contained in [the national bank act].... " The act creating the production credit association did not.

The appellees apply the two criteria employed in *Brenham* —bank characteristics and state tax provisions in the federal act creating the entity—and conclude that Edge corporations, both in terms of their status under federal law and their functions, more closely resemble the production credit associations than the joint stock land banks. We disagree.

■ An Edge corporation is "engaged in banking" if it is ordinarily engaged in the business of accepting deposits in the United States from nonaffilated persons, according to the Federal Reserve Board. 12 C.F.R. § 211.2 (1983). It may receive demand, savings, and time deposits from foreign governments, persons conducting business principally at their offices or establishments abroad, individuals residing abroad, and others. That its principal function is the financing of foreign transactions, international activities, imports, and exports does not preclude its being considered a bank; nor do the limitations placed upon its depository activities. *Id.* See "Bank" in *Black's Law Dictionary* 131 (5th ed. 1979).

The language employed by Congress in 12 U.S.C. § 627, like that used in *Joint Stock, supra,* also supports inclusion of Edge banks under § 11.02(d). Shares of Edge corporation stock are to be subject to tax "in the same manner and to the same extent as the shares of stock in similar State corporations." 12 U.S.C. § 627. By prescribing the same standards of taxation for Edge banking corporations as for a state's own banks, Congress apparently intended such banks to be treated no differently from any other nationally chartered bank. As in *Joint Stock, supra,* MGIB falls within the scope of the taxing statute. *Brenham, supra,* simply reinforces this conclusion. The Supreme Court in *Brenham* was not concerned that the production credit association and the joint stock land bank had not been established under the National Bank Act. Inclusion within Article 7166 depended upon other factors.

Certainly the ad valorem tax assessed on shares of MGIB at the place where it is conducting its business operations in Texas must logically be authorized by § 11.02(d). Any other construction of that statute would be in contravention of the law and would permit shareholders of an out-of-state corporation to take advantage of the economic environment, benefits, protection, and services offered by the local community and then remove the profits to another state without paying any *quid pro quo* for the advantages obtained. It is only fair that shareholders of Edge Act corporations return a proportionate share of profits derived from doing business in this state. *Michelin Tire Corporation v. Wages,* 423 U.S. 276, 289, 96 S.Ct. 535, 542, 46 L.Ed.2d 495 (1976); *Texas Land and Cattle Company v. City of Fort Worth,* 73 S.W.2d 860, 864 (Tex.Civ.App.—Fort Worth 1934, writ ref'd). Appellant's point of error five is sustained.

Point of error six asserts error as a matter of law because the trial court failed to comply with Rule 683 of the rules of civil procedure. Point of error seven alleges there was no evidence to support the issuance of a permanent injunction.

Rule 683 provides, in pertinent part:
Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained....

(Vernon 1967). The judgment appealed from simply states that the court, "having

heard the arguments of counsel thereon, and having reviewed the motions, affidavits, and briefs," grants the motion for summary judgment, "and defendants are permanently enjoined from attempting to collect the 1981 taxes assessed on bank shares issued by Morgan Guaranty International Bank and made the subject of this action." The judgment goes on to deny the appellants' motion for summary judgment and orders each party to pay its own costs of court. The judgment does not recite any reasons for granting the injunction. Appellants were unsuccessful in their attempt to determine those reasons by the filing of a written request for findings of fact and conclusions of law.

■ Appellants' complaint must fail because the provision in Rule 683 requiring that reasons for issuance of an injunction be stated applies only to ancillary injunctive relief and not to final judgments whose sole object is to obtain a perpetual injunction. *Alexander Schroeder Lumber Co. v. Corona*, 288 S.W.2d 829, 835 (Tex.Civ.App.—Galveston 1956, writ ref'd n.r.e.); *Gasperson v. Madill National Bank*, 455 S.W.2d 381, 382, 398 (Tex.Civ.App.—Fort Worth 1970, writ ref'd n.r.e.); *Texas Liquor Control Board v. Bacon*, 443 S.W.2d 312, 317 (Tex.Civ.App.—Austin 1969), *rev'd on other grounds*, 456 S.W.2d 891 (Tex. 1970).

■ Had Rule 683 applied to the judgment herein, and had this not been a summary judgment proceeding, the court's filing of findings of fact and conclusions of law would not have cured the fatal defect. *Schulz v. Schulz*, 478 S.W.2d 239, 245 (Tex. Civ.App.—Dallas 1972, no writ). Since this was a summary judgment proceeding, findings of fact and conclusions of law are neither required nor appropriate. *State v. Easley*, 404 S.W.2d 296, 297 (Tex.1966); *Fulton v. Duhaime*, 525 S.W.2d 62, 64 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). Appellants' sixth point of error is overruled.

■ With regard to the appellants' no evidence claim, the only evidence submitted by appellees is the affidavit of Robert S.

Devens, vice president of MGIB and general manager of the Houston branch office. This document establishes that MGIB is a banking corporation organized in accordance with the Edge Act, 12 U.S.C. §§ 611–631, and that it was conducting banking business within the City of Houston and the Houston Independent School District prior to and throughout the tax year 1981. In view of the foregoing discussion under points of error one, four, and five, this affidavit does not establish that appellees have a right as a matter of law to the injunctive and declaratory relief requested in their petition. Appellants' seventh point of error is sustained.

■ Appellants' eighth and final point asserts error in the court's failure to grant their own motion for summary judgment since they had established a prima facie case against the appellees. A taxing authority establishes its prima facie case as to every material fact necessary to establish the cause of action when it introduces a copy of the delinquent tax record, certified by the proper taxing authority to be true and correct, with the amount stated thereon to be unpaid. *Davis v. City of Austin*, 632 S.W.2d 331, 333 (Tex.1982); *Houston Crane Rentals, Inc. v. City of Houston*, 454 S.W.2d 216 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd n.r.e.) (summary judgment case).

■ Attached to appellants' original answer and counterclaim is a copy of the delinquent tax statement, with the amount stated thereon to be unpaid, certified to be true and correct as shown by the tax rolls by William R. Brown, Jr., Assessor and Collector of Taxes for the City of Houston and the Houston Independent School District. Attached to its motion for summary judgment is a copy of the same certified delinquent tax record, along with an affidavit by Janice M. Delry, Deputy Tax Collector for the appellant city and school district, affirming the truth and accuracy of the attached statement. Appellees have failed to rebut the evidence forming appellants' prima facie case; appellants are enti-

tled, therefore, to prevail on their motion for summary judgment. Appellants' point of error eight is sustained.

The judgment is accordingly reversed and rendered in favor of the appellant taxing authorities. The injunction issued by the trial court prohibiting collection of 1981 taxes due under Texas Tax Code § 11.02 is hereby set aside and dissolved. It is further ordered, adjudged, and decreed that the City of Houston and the Houston Independent School District have judgment from December 29, 1982, against Morgan Guaranty International Bank and Morgan Guaranty Trust Company of New York in the amounts of $85,967.62 and $105,924.38 respectively, together with penalties, interest, costs of court, and attorney's fees, as provided by law.